IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TIMOTHY STAYER

       Petitioner,                  No. CIV S-09-2588 MCE CHS P

    vs.

M. McDONALD,

       Respondent.       <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

## I. INTRODUCTION

Petitioner Timothy Stayer, a state prisoner, proceeds through appointed counsel with a second amended petition for writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. Petitioner stands convicted of first degree murder, conspiracy to commit torture, torture, kidnapping, and destruction of evidence in the Shasta County Superior Court, case number 04F8744, for which he is currently serving a term of life in prison without the possibility of parole, plus an additional consecutive life term, plus various other terms to run concurrent with the life sentences. The second amended petition, respondent's answer, petitioner's traverse, and both parties' supplemental briefs are before the court. Based on a thorough review of the record and applicable law, it is recommended that the petition be denied.

/////

1

## II.  BACKGROUND

The victim, Christopher McCauliffe, died on November 21, 2004.  Several codefendants were charged with various crimes in connection with his murder.  Petitioner was charged with murder (count one); conspiracy to commit torture (count two); torture (count three); kidnapping (count four); and destruction of evidence (count six).  As an enhancement and special circumstance, it was alleged that the murder was committed in the course of felony kidnapping.  As an additional enhancement, it was alleged that petitioner had previously incurred a felony conviction.

Petitioner was tried in a joint trial with one other co-defendant, his brother Robert Stayer.  The California Court of Appeal's background summary of the case on direct review is recounted below.  The footnotes, while numbered differently than in the original, are those of the California Court of Appeal.  Since these factual findings have not been rebutted with clear and convincing evidence they are presumed correct.  28 U.S.C. § 2254(e)(1); *Taylor v. Maddox*, 336 F.3d 992, 1000 (9th Cir. 2004).   For the sake of simplicity, Timothy Stayer, Robert Stayer, and Robert's wife, Kimberly Stayer, are referred to by first name in the court of appeal's factual summary opinion and in the rest of this report, except where Timothy Stayer is referred to as the petitioner.

### FACTUAL AND PROCEDURAL BACKGROUND

### Prosecution evidence[1]

Defendants [Timothy and Robert] did not testify, but their recorded statements to the police were played for the jury in redacted form. (The transcripts given to the jury were not admitted in evidence, but the parties do not dispute their accuracy.) The trial court instructed the jury that neither defendant's statement could be used against the other defendant.

/////

---

[1] Under this heading we recount the evidence in support of the verdicts, regardless of which party offered it.

**The crimes**

In November 2004, defendants, who are brothers, and Kimberly lived with defendants' mother ([Katherine] Tuschen) and her three younger children in Anderson, California.[2]

On the evening of Saturday, November 20, defendants and friends went to a party. Timothy went with Haley Savage in her Nissan Altima; Robert, [Kevin] Skelton, and [Daniel] Coyne went in Coyne's Chevy Silverado pickup.[3]

Meanwhile, Tuschen and Christopher McCauliffe met at a bar and decided to have sex. She brought him home after midnight on November 21. No one was there.

After leaving the party, Robert, Skelton, and Coyne bought two 12-packs of beer and went to a friend's apartment in Redding. Savage drove Timothy home to pick up his cell phone charger.

Savage parked and waited while Timothy, who lacked a key, knocked on the front door, then went to the back.[4] Through an opening in the blinds, he saw Tuschen having sex with McCauliffe. After [Tushcen] heard Timothy knocking, she let him in.

Timothy, hearing McCauliffe's name, realized that he was the boyfriend of Timothy's ex-girlfriend, Laura Minkoff. Timothy left her a message on his cell phone. McCauliffe then attacked him.

In the ensuing fistfight, Timothy broke McCauliffe's nose, blackened one eye, and spattered blood all over the bedroom. After taking him out of the house, Timothy put him in a chair on the front porch.[5]

McCauliffe's body, when found, showed evidence of recent severe diarrhea. Forensic pathologist Dr. Susan Comfort opined that such diarrhea is an effect of Diazinon poisoning.

At some time, Timothy called Robert. Timothy told the police that

---

[2] All unspecified dates are in 2004.

[3] Kimberly, also at the party, stayed when the others left. She and Robert had not been getting along lately.

[4] At some point, Savage drove away, but then returned, as we explain below.

[5] According to Tuschen, she smelled that McCauliffe "messed his pants" after his initial beating, while still in the house. Robert also told the police and Kimberly that when he got to the house "[i]t smelled like someone shit their pants." However, the other persons directly involved in McCauliffe's ordeal did not corroborate this claim.

he said, "I'm locked out of the house ... and mom's having sex with somebody." Robert told the police that Timothy said "get down to the house" because of a "problem." According to Kimberly, Robert later told her that Timothy had urged them to come "[t]o beat up Christopher McCauliffe"; however, she called this a "paraphrase." According to Coyne, after taking the call Robert said, "We have to go. There's trouble[,]" then said, "There's some guy at the house." According to Skelton, Robert said that they "needed to go to Anderson," but did not explain why.

Robert, Skelton, and Coyne drove quickly to Tuschen's house in Coyne's pickup, taking their beer. When they arrived, Timothy and Tuschen were standing by the front door; Timothy was yelling at McCauliffe, who sat in a chair on the porch, badly beaten and bloody.

Timothy said to Robert: "Hey [b]ro, this guy's been fucking mom" (or words to that effect).[6] According to Coyne, Robert threw a beer bottle, hitting McCauliffe in the forehead, and followed up with a punch that knocked him off the chair.[7] As he lay on the ground unresisting, Robert hit him four or five more times until pushed away and told to "chill" by Coyne. McCauliffe remained motionless on his side.

Timothy dragged McCauliffe face-down into the garage, then hovered over him cursing. Robert, Skelton, Coyne, and Tuschen also entered the garage. The door shut.

Coyne testified that he did not see any more abuse of McCauliffe in the garage before going into the house, as Skelton and Tuschen also did. Robert came in with Coyne, but must have gone back out. Timothy apparently remained in the garage.

A few minutes later, Robert came back in holding a jug or bottle and said to Coyne: "I poured this on him"; asked why, he shrugged. According to Kimberly, Robert later said he had poured "bug spray" on McCauliffe's eyes because McCauliffe was trying to use his cell phone.[8]

Timothy told Coyne to back up his truck to the garage. Timothy and Skelton picked McCauliffe up and walked him to the truck,

---

[6] Robert told the police that Timothy said, "this guy tried to rape my mom."

[7] Skelton testified that, because his back was turned, he did not see why McCauliffe fell off the chair. He agreed, however, that they had taken beer bottles off the truck as they walked toward the house.

[8] Robert denied to the police that he poured anything on McCauliffe, but admitted that he took McCauliffe's cell phone away, then threw it in the river at the park.

4

which he put his hand on to steady himself. Coyne saw "some type of liquid on him" which smelled so horrible that it was hard to breathe. McCauliffe said, "I can't see" and "[i]t burns."

After McCauliffe sat on the tailgate, Timothy and Skelton put him into the truckbed. Coyne, Robert, and Skelton drove away from the house. No one had said where they were going.

According to Coyne, he stopped and asked Robert where to go; Robert directed him to the boat ramp at Anderson River Park, four or five minutes away, but would not say why.[9] When they arrived there, it was very cold.

Skelton dragged McCauliffe out of the truck, dropped him onto the parking lot, straddled him, and kicked him twice in the ribs, saying: "Don't mess with people's mothers."[10] Next, Robert (whom Coyne believed to weigh 240 or 250 pounds) stomped McCauliffe in the head around eight times, jumping up and down while holding a cell phone taken from McCauliffe. Coyne heard McCauliffe's head hitting the asphalt. Skelton finally ran over and stopped Robert.

Robert, Skelton, and Coyne then drove back to the house, leaving McCauliffe lying on the asphalt. No one called 911 to get help for him.

Savage, who had driven away, returned to the house in time to see McCauliffe carried out to Coyne's truck and the truck pull away. She called Timothy, who came out and sat in the driver's seat as she moved over. He smelled of pesticide, but claimed he did not know why. They drove to the boat ramp, where she saw someone on the ground. Timothy went over to him, came back quickly, and said: "He's fine. He's breathing. He's okay." She said they needed to call 911; he replied, "I know, I know," but did not call. They returned to the house. In the garage, Savage saw blood and smelled the odor she had noticed on Timothy.

When Robert, Skelton, and Coyne got back to the house, they found Timothy hosing down the porch, while Tuschen was inside shampooing the carpet.[11] According to Coyne, the garage smelled strongly of pesticide.

---

[9] Coyne claimed that Robert drove from then on, but Skelton claimed that Coyne drove all the way.

[10] According to Skelton, Coyne also kicked McCauliffe once or twice in the parking lot. Coyne denied hitting or kicking McCauliffe.

[11] She had already put the bloodstained bedsheets through the washer and dryer in the garage. The police later found bloodstains in the washer with DNA that matched McCauliffe's.

When Timothy heard that the others had gone to the boat ramp, he said that he had thought they would go to a big tree in the park called the "Senior Tree."

According to Coyne, after 20 minutes at the house, he and Robert drove in the truck, which smelled of pesticide, to a house where Robert did a drug deal, then to a car wash. They were met by Timothy, Skelton, Savage, Kimberly, and Kimberly's sister, who came in Savage's car, driven by Timothy. The group tried to purge the vehicles of evidence as some of them discussed and acted out what was done to McCauliffe, unaware that the car wash's video recorders were taping it all.

Timothy and Savage drove to her home. Robert, Kimberly, and Coyne dropped off Skelton, then checked in at a Motel 6 around 3:30 a.m.; claiming to lack identification, Robert gave Coyne money to rent the room. Once inside, Robert cleaned blood from his lower leg.

After a cell phone discussion with Timothy, Coyne drove to Savage's home. Timothy said that he had gone to the boat ramp, seen McCauliffe, and heard him wheezing. Alarmed, Coyne decided to check on it; Savage let him take her car.

At the boat ramp, Coyne found McCauliffe lying motionless and unresponsive. Coyne called Timothy, who told him to put McCauliffe in the back seat of Savage's car. Timothy and Savage then drove there in Coyne's truck.

Timothy went over to McCauliffe, shook him, and announced: "Dude is dead as fuck." He told Coyne again to put the body in Savage's back seat and take it away. According to Coyne, he said: "No, we have to call the cops," but Timothy answered: "No, we can't do that." According to Savage, Timothy came back to the truck and said: "I don't think he's okay. And I don't think he's breathing, but I don't know." He then got into Savage's car, in which he and Coyne returned to Tuschen's house, leaving McCauliffe's body behind; Savage followed in Coyne's truck.[12]

According to Kimberly, Timothy then came to the Motel 6, carrying McCauliffe's wallet in a plastic bag.[13] Timothy told Robert: "We killed him, bro."

Timothy, Robert, and Kimberly bought cleaning supplies at a Wal-Mart. After dropping Timothy off at Savage's home, Robert

---

[12] Blood was later found near the seat-adjustment button of Savage's driver's seat.

[13] Robert later threw the wallet onto Interstate Highway 5, from which the police retrieved it after Kimberly told them where to look. Kimberly testified under a grant of immunity.

and Kimberly went on to the house, where Robert cleaned the garage with ammonia and Tuschen gave Kimberly bedsheets to dispose of. Behind a flea market in Redding, they burned the bedsheets and Robert burned some of his clothing; Skelton burned some of his there at another time.[14]

At 9:30 a.m. on November 21, Timothy woke Laura Minkoff at home and said: "We didn't mean for it to go this far." Unaware of his phone message, she did not know what he was talking about. After they listened to it, he told her about the fight, claiming that he had intended only to take McCauliffe to her place to make him confess.[15] Later, Timothy claimed [to Minkoff] that he had left the house after putting McCauliffe on the porch, had learned by calling Robert that the others had taken McCauliffe to the boat ramp, and had gone there only to find him dead; after that, they had bought cleaning supplies and cleaned up the house.[16] To corroborate his story, Timothy handed Minkoff the watch she had given McCauliffe; Timothy also told her that they had thrown McCauliffe's wallet, which she had made for him, into the river.

On November 22, defendants, Coyne, Skelton, Savage, and Kimberly met and agreed to keep silence. After spending the night at Minkoff's home, Timothy and Savage went to Sacramento for several days.

**Forensic evidence**

The police found McCauliffe at the boat ramp around 8:00 a.m. on November 21. The first officer on the scene caught a heavy smell of insecticide, which he recognized as Diazinon.[17] He determined that McCauliffe was dead.

Forensic pathologist Dr. Susan Comfort found that the chemical smell coming downwind emanated from an oily liquid on the victim's person and clothes. A frothy red-pink fluid was coming out of his nose and mouth, which struck Dr. Comfort as "a bit peculiar."

The smell was so overpowering that Dr. Comfort and her assistants began examining the body outdoors. After they took it inside, she donned a respirator, but nevertheless suffered nausea, asthmatic

---

[14] Kimberly later led the police to the burn sites.

[15] He said he was not the one who had hit McCauliffe with the beer bottle.

[16] By the time he told Minkoff these things, she had contacted the Anderson police.

[17] This officer detected the same smell, "very strong and overwhelming," at the autopsy on November 22, and later in the garage of the Tuschen house.

symptoms, a sore throat, and a headache during and after the autopsy.

The victim's head and neck had multiple blunt force trauma injuries "consistent with a very severe beating." These included a deep laceration toward the back of the head which went completely through the scalp and pulled it away from the skull, a broken nose, deep bruising and swelling around the eyes, and many other abrasions and contusions, some possibly from a bottle striking the forehead.[18]

On the left upper chest and arm, the skin was sloughing off and discolored, as if chemically burned. There were also multiple abrasions and contusions on the arms and legs and possible defensive wounds on the hands and forearms.

The victim's brain, which was mildly swollen, showed surface hemorrhages just below the scalp and a subarachnoid hemorrhage in the cerebellum. The brain had also suffered global hypoxic ischemic injury, meaning that neurons had started to die from impaired blood flow; the insult to the brain had occurred four to six hours before death. In other words, "there was a prolonged period of time before he finally expired."

Internal examination further showed bleeding in the neck muscles and soft tissues consistent with a forceful injury to the neck surface, and bruising in the small intestine consistent with a blow to the abdomen.

Blood and lung tissue tests detected Diazinon, the blood at a level of 0.05 microgram per milliliter and the lung tissue at the higher level of 0.16 microgram per gram. The victim's vitreous humor, or eye fluid, contained Diazinon metabolites, indicating that the substance had passed through the liver.

Froth like that found on the victim's mouth normally results from death by seizure or drowning; Dr. Comfort had never seen it before in a beating death. Diazinon, an organophosphate poison, can cause the respiratory distress which produces such froth. Dr. Comfort also found a high level of pulmonary edema, another possible result of organophosphate poisoning.

The victim's buttocks and the backs of his legs were covered with loose stool. This is rarely found postmortem. It can be a symptom of organophosphate poisoning.

The victim's blood alcohol level was .26 percent, which is too low

---

[18] She acknowledged that other means of inflicting blunt force could also have caused these injuries.

to be toxic. In an alcohol-tolerant person, it might not even cause unconsciousness.[19]

On the morning of November 21, it was "really chilly" at the boat ramp, with a cold wind blowing off the river. A person left out in such conditions, unconscious or incapacitated and wearing soaking-wet light clothing, will likely develop hypothermia. As body temperature at the time of death was unknown, Dr. Comfort could not say for sure that hypothermia contributed to death, but she thought it "very probable."

The multiple contributory factors made the cause of death "really difficult ... to analyze." However, Dr. Comfort concluded that the victim died of blunt force trauma, with likely contributory factors including Diazinon poisoning and hypothermia.

Dr. Comfort's autopsy report listed Diazinon poisoning only as a contributory factor because the toxicology tests were inconclusive. The true Diazinon level at the time of death was probably unknowable: Diazinon breaks down over time, and the samples were not tested until weeks after the victim's death. The dead neurons in his brain, suggesting breathing difficulty, pointed to Diazinon.

Hypothermia was also a likely contributory factor because it would slow respiration in a person already breathing with difficulty from poisoning and head injuries, plus the effect of a .26 percent blood alcohol level. These factors would work together to depress brain function lethally.

**Other expert testimony**

An expert on organophosphate poisoning, Dr. Michael O'Malley, opined that "full-blown poisoning" (rather than odor-caused "direct irritant effects") was unlikely to be "the main cause of death" because the toxicology results did not show sufficient absorption into the victim's system.[20]

Dr. Comfort did not disagree with Dr. O'Malley's conclusion. She took exception, however, to his ascription of the victim's "oral nasal froth, copious diarrhea, [and] pulmonary edema" to "terminal hypoxia" rather than Diazinon poisoning: she had not seen such froth or diarrhea in any purely "asphyxial" death. She also noted that Dr. O'Malley's report erroneously discussed nonexistent urine test results rather than the actual vitreous humor test results, which could have affected his analysis.

_____

[19] Laura Minkoff testified that McCauliffe was a high-functioning alcoholic.

[20] As already noted, Dr. Comfort did not call it "the main cause of death."

**Defense case**

Robert called Tuschen and Skelton as witnesses.

In addition to the testimony already mentioned, Tuschen stated that she never smelled any chemical or pesticide odor on her premises and never saw anyone washing off the porch. She cleaned up the blood inside because she did not want her younger children to see the "mess." She did not know what happened at her house on the night of November 20-21 after Timothy's initial fight with McCauliffe. She admitted, however, that she had given bedsheets to Kimberly and possibly a jug of Diazinon to her or Robert to be burned. She also admitted that when Timothy was in jail, she told him to tell a potential witness not to talk to the police.

Skelton was called to impeach Coyne's credibility by portraying him as a full participant in the crimes. However, Skelton did not deny his own involvement.

*People v. Stayer*, No. L 2404203, 2008 WL 2404203 at 1 -6 (Cal.App. 3rd Dist. 2008).

Coyne and Skelton entered plea bargains for the dismissal of some charges and stipulated sentences on the remaining charges in exchange for their testimony against petitioner and Robert.  Kimberly, Haley Savage, and Laura Minkoff were offered immunity in exchange for their truthful testimony.

A jury convicted petitioner of all counts, consisting of first degree murder, conspiracy to commit torture, torture, kidnapping, and destruction of evidence.  The jury found true the kidnapping special circumstance as alleged to the murder count, and a great bodily injury enhancement as to the torture count.  He admitted the prior prison term allegation.

Petitioner was sentenced to life without the possibility of parole for the murder and special circumstance, consecutive to another life sentence for torture.  The court imposed the upper term of 8 years for kidnapping, an additional year for the prior prison term allegation, and six months for destruction of evidence, all to be served concurrent to the indeterminate terms.  A additional consecutive life sentence for conspiracy to commit torture was stayed.

On direct review, the California Court of Appeal, Third District, affirmed the judgment and sentence.  A petition for review to the California Supreme Court was denied.  After

this federal action commenced, petitioner sought habeas corpus relief in the California Supreme Court; that petition was likewise denied prior to appointed counsel's filing of the second amended petition.

The parties agree that petitioner properly exhausted state court remedies with respect to the claims presented to the extent that they renew the same factual allegations made in state court.  Respondent contends, however, that petitioner's ground four is untimely filed, and that grounds two, four, and six were procedurally defaulted and thus barred in this court.

### III.  GROUNDS FOR RELIEF

Petitioner's grounds for relief are summarized as follows:

Ground One:  Insufficient evidence supported the conspiracy conviction.

Ground Two:  The jury instructions on derivative liability were constitutionally inadequate.

Ground Three:  The prosecutor committed prosecutorial misconduct and trial counsel rendered ineffective assistance in relation to Kimberly's marital privilege, which was not asserted at trial.

Ground Four: Trial counsel rendered ineffective assistance in failing to object to the use of Kimberly's testimony at trial as involuntary and a violation of due process.

Ground Five:  The trial court failed to instruct the jury that it had to agree on the acts on which the guilty verdicts were based in violation of due process.

Ground Six: The trial court's instructions on the doctrine of natural and probable consequences allowed conviction without proof beyond a reasonable doubt of every fact necessary to constitute the crimes charged.

Ground Seven:  The trial court erred by instructing on the special circumstance with CALCRIM No. 730 but not CALCRIM Nos. 700 and 703.

Ground Eight:  The trial court's instruction on "felony murder- first degree" omitted an element of the offense.

Ground Nine:  Insufficient evidence proved Robert's premeditation and deliberation, which in turn invalidates petitioner's first degree murder conviction to the extent it was based on aider and abettor liability or conspiracy.

/////

/////

11

IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001). This court looks to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003).  It is the habeas corpus petitioner's burden to show the state court's decision was either contrary to or an unreasonable application of federal law.  *Woodford v. Visciotti*, 537 U.S. 19, 123 S. Ct. 357, 360 (2002).

/////

/////

/////

# V.  DISCUSSION

A.        Ground One- Sufficiency of the Evidence on Conspiracy

Petitioner claims that insufficient evidence supported the jury's verdict on count two, conspiracy to commit torture.  The last reasoned state court decision applicable to this claim for AEDPA purposes is that of the California Court of Appeal on direct review.  The court of appeal held:

> Timothy contends that the evidence does not support his conviction of conspiracy to commit torture (count 2)... The evidence on this count was sufficient.
>
> "Pursuant to section 182, subdivision (a)(1), a conspiracy consists of two or more persons conspiring to commit any crime. [Fn .] A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy. [Citations.]" (*People v. Morante* (1999) 20 Cal.4th 403, 416, 84 Cal.Rptr.2d 665, 975 P.2d 1071.) Thus, the People had to prove that defendant specifically intended (1) to agree with another person to commit torture and (2) to commit the elements of that offense. (*People v. Jurado* (2006) 38 Cal.4th 72, 123, 41 Cal.Rptr.3d 319, 131 P.3d 400.) However, since a conspirator is responsible for everything done by his coconspirators as part of their common design, the People did not have to prove that defendant personally committed or intended personally to commit torture. (*People v. Morante, supra,* 20 Cal.4th at p. 417, 84 Cal.Rptr.2d 665, 975 P.2d 1071.)
>
> Circumstantial evidence may prove conspiracy without an express verbal agreement. (*People v. Longines* (1995) 34 Cal.App.4th 621, 626, 40 Cal.Rptr.2d 356.) This evidence may include "the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135, 36 Cal.Rptr.2d 235, 885 P.2d 1.) [FN27]
>
> > FN27. Timothy cites a federal appellate decision for the rule that "[a]n inference of an agreement is permissible only when the nature of the acts would logically require coordination and planning." (*United States v. Garcia* (9th Cir.1998) 151 F.3d 1243, 1245.) However, we are not bound by federal appellate decisions (*Adams v. Pacific Bell Directory* (2003) 111 Cal.App.4th 93, 97, 3 Cal.Rptr.3d 365), and Timothy does not cite California

13

authority for this rule. To the extent it may differ from California law, therefore, we need not follow it.

"Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain." (§ 206.)

Viewed most favorably to the judgment, the evidence showed: After beating McCauliffe severely, Timothy urgently summoned Robert, Skelton, and Coyne and used the most inflammatory language possible-telling Robert that McCauliffe had "fuck[ed]" or "rap[ed]" their mother-to incite them to further violence "for the purpose of revenge ... or for any sadistic purpose" (§ 206). [FN28] The jury could reasonably have inferred that Timothy knew Robert's capacity for rage and meant to trigger it. Then, having watched Robert brutally beat the already helpless McCauliffe, Timothy inflicted further pain on him by dragging him face-down into the garage. Then (apparently making no effort to intercede), Timothy watched Robert pour insecticide on McCauliffe, which any reasonable person would have expected to cause "cruel or extreme pain and suffering." (§ 206.) (Even if Timothy had not expected that, McCauliffe's cries-"I can't see" and "It burns"-would have revealed that it did so.) Then, Timothy orchestrated the next stage of the proceedings, directing McCauliffe's removal from the house (minus wallet and cell phone) by Robert and his friends. Timothy could only have expected them to do more of the same to McCauliffe once they reached their destination. Furthermore, his remark about "the Senior Tree" shows that he expected them to take McCauliffe to the park, a deserted and bitterly cold spot where they could torture him further without fear of discovery or intervention.

> FN28. Although only Kimberly testified that Timothy specifically urged them to come and "beat up" McCauliffe, and she conceded that she was paraphrasing Robert's account on this point, the jury could also have believed that Timothy said essentially that. In any event, his words to Robert on the porch amounted to the same incitement in other terms.

It is immaterial that Timothy did not personally beat McCauliffe again after the others came to the house, that he did not tell them where to take him, that he did not go with them to the park, and that he did not communicate with them there. He acted consistently from beginning to end: having beaten McCauliffe into helplessness, he set out to ensure that Robert and their friends would continue what he had started. Since McCauliffe was already undergoing "pain and suffering" before they reached the house, the

1   jury could reasonably have found that Timothy's conduct from the
    moment he summoned them constituted the formation of a
2   conspiracy with them to torture McCauliffe, followed by overt acts
    by Timothy and the others toward its execution.

3
    [S]ufficient evidence supported Timothy's conviction for
4   conspiracy to commit torture[.]

5   *People v. Stayer*, *supra*, at 6-8 (footnote omitted).

6          The Due Process Clause protects the accused against conviction except upon

7   proof beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358, 364 (1970).  On habeas corpus

8   review, sufficient evidence supports a conviction so long as, "after viewing the evidence in the

9   light most favorable to the prosecution, any rational trier of fact could have found the essential

10  elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319

11  (1979); se*e also Prantil v. California*, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam).  The focus

12  under *Jackson* is not the correctness, but rather, the reasonableness of the state judgement.  *See*

13  *Hurtado v. Tucker*, 245 F.3d 7, 19 (1st Cir. 2001).

14         The *Jackson* standard must be applied "with explicit reference to the substantive

15  elements of the criminal offense as defined by state law."  *Davis v. Woodford*, 384 F.3d 628, 639

16  (9th Cir. 2004) (*quoting Jackson*, 443 U.S. at 319.)  The dispositive question is "whether the

17  record evidence could reasonably support a finding of guilt beyond a reasonable doubt."  *Chein v.*

18  *Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (*quoting Jackson*, 443 U.S. at 318).  Under the

19  AEDPA, the *Jackson* standard is applied with an additional layer of deference.  *Juan H. v. Allen*,

20  408 F.3d 1262, 1274-75 (9th Cir. 2005).  The relevant question here is "whether the decision of

21  the California Court of Appeal reflected an 'unreasonable application of' *Jackson* and *Winship* to

22  the facts of this case."  *Id*. (citing 28 U.S.C. § 2254(d)(1)).

23         Accepting the court of appeal's interpretation and application of state law

24  regarding the elements of conspiracy to commit torture, as this court is required to do (*see*

25  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law, including

26  one announced on direct appeal of the challenged conviction, binds a federal court sitting in

1  habeas corpus")), the record evidence reasonably supports a finding that petitioner was guilty of

2  conspiracy to commit torture.

3          The prosecution had to prove, first, that petitioner and at least one other person

4  had the specific intent to agree or conspire to commit torture.  Such an agreement could have

5  been reasonably inferred from Kim's testimony that Robert stated that Tim had called him to

6  have him come home to beat up Christopher McCauliffe (RT at 1176, 1212), combined with

7  Skelton's testimony that, when Rob arrived, Tim said "Hey, Bro, This guy's been fucking mom"

8  (RT at 1589, 1671), after which Chris was knocked out of his chair by someone, picked up by

9  Tim, and then taken to the garage where he was beaten further.  (RT at 1591.)  The prosecution

10  also had to prove that Tim had the specific intent to torture McCauliffe, i.e., cause great bodily

11  injury with intent to cause cruel or extreme pain and suffering for the purpose of revenge,

12  extortion, persuasion, or for any sadistic purpose.  But since it was not required that petitioner

13  specifically intend to *personally* torture McCauliffe, this intent could have been reasonably

14  inferred from Tim's continued presence during the beatings and during the use of insecticide in

15  the garage.  Likewise, the prosecution was not required prove an overt act by Tim; rather, a single

16  overt act by any co-conspirator sufficed.

17          Petitioner concedes that an agreement to conspire may be inferred from

18  circumstantial evidence.  Petitioner cites *United States v. Garcia*, 151 F.3d 1243, 1245 (9th Cir.

19  1998), however, for the proposition that "[a]n inference of an agreement is permissible only

20  when the nature of the acts would logically require coordination and planning."  Petitioner also

21  cites *Garcia* and other Ninth Circuit precedent that evidence of "more chaos than concert" does

22  not establish that parties to a conspiracy "work[ed] together understandingly, with a single design

23  for an accomplishment of a common purpose."  *See*, *e.g.*, *Id*.  Circuit precedent does not,

24  however, constitute "clearly established Federal law, as determined by the Supreme Court."  28

25  U.S.C. § 2254(d)(1)); *see also Renico v. Lett*, 130 S.Ct. 1855, 1866 (2010).  Thus, a showing that

26  the state court failed to apply the *Garcia* decision does not authorize habeas corpus relief under

1   AEDPA. *See Renico*, 130 S.Ct. at 1866. Nor can the Ninth Circuit's *Garcia* decision be

2   understood merely to illuminate the applicable standards of *Winship* or *Jackson* which must be

3   applied here. *See Nunes v. Ramirez-Palmer*, 485 F.3d 432, 441 n.5 (9th Cir. 2007) (explaining

4   that circuit precedent may be relevant to the extent it illuminates the application of clearly

5   established federal law as determined by the United States Supreme Court); s*ee also Renico*, 130

6   S.Ct. at 1866 (holding that circuit precedent does not merely illuminate Supreme Court case law

7   to any extent it establishes its own factors as a constitutional test).

8          In sum, this claim amounts to an attempt by petitioner to construe the record in a

9   more favorable manner with respect to the issue whether he harbored the requisite intent for

10  conspiracy to commit torture. This court, however, must view all evidence in the light most

11  favorable to the prosecution. *Jackson*, 443 U.S. at 319. The decision of the California Court of

12  Appeal was not an unreasonable application of the demanding *Winship* or *Jackson* standards.

13                 B.        Ground Two- Jury Instructions on Derivative Liability

14         Petitioner claims that the instructions on derivative liability were so "conflicting,

15  complex, generic and amorphous" that the jury might not have made all constitutionally required

16  factual findings sufficient to reach a verdict under the Fifth , Sixth and Fourteenth Amendments.

17  To support this claim, petitioner cites various instructions given and basically alleges that they

18  were too confusing for the jury to understand. The crux of petitioner's argument is that "[t]he

19  jury would not have understood the issues it had to decide before it could convict Tim Stayer, but

20  instead would have understood that making the phone call, and informing Kevin, Rob and

21  Danny, when they arrived at the house that Chris was "the guy that was fucking Mom," was

22  sufficient to convict Tim of all charges."

23         On direct review, the court of appeal applied California's contemporaneous

24  objection rule to find that the claim had not been preserved for appeal. The court held:

25         This claim is not preserved for appeal.

26         Timothy does not argue that the instructions were incorrect, only

17

that they were unclear or incomplete. A defendant may not raise
this claim on appeal unless he requested clarifying instructions
below. (*People v. Alvarez* (1996) 14 Cal.4th 155, 222-223, 58
Cal.Rptr.2d 385, 926 P.2d 365.) As Timothy did not do so, the
claim is forfeited.

But even if it were properly before us, we would reject it. Though
Timothy complains that the instructions mentioned underlying
crimes or degrees of crimes "generically" and "non-specifically"
rather than spelling them out, he cites no authority holding that
such specificity is required. We do not consider legal propositions
asserted without authority. (*Amato v. Mercury Casualty Co.* (1993)
18 Cal.App.4th 1784, 1794, 23 Cal.Rptr.2d 73.)

Finally, though Timothy insists that the jurors must have been
confused, he cites no evidence that they were. His unfounded
speculation is not cognizable.

*People v. Stayer*, *supra*, at 8.

Respondent contends that petitioner has procedurally defaulted this claim because

trial counsel failed to make an objection at trial.  As a general rule, a federal habeas court "will

not review a question of federal law decided by a state court if the decision of that court rests on

a state law ground that is independent of the federal question and adequate to support the

judgment." *Calderon v. United States District Court (Bean)*, 96 F.3d 1126, 1129 (9th Cir. 1996)

(quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  For a state procedural rule to be

independent, the state law basis for the decision must not be interwoven with federal law.

*LaCrosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001).  To be deemed adequate, it must be well

established and consistently applied.  *Poland v. Stewart*, 169 F.3d 575, 577 (9th Cir. 1999).  An

exception to the general rule exists if the prisoner can demonstrate either cause for the default

and actual prejudice as a result of the alleged violation of federal law, or that failure to consider

the claims will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.

Once the state has pleaded the existence of an independent and adequate state

procedural ground as an affirmative defense, as respondent has in this case, the burden shifts to

petitioner to place the adequacy of that procedural rule in issue.  *Bennett v. Mueller*, 322 F.3d

573, 586 (9th Cir. 2003).  Thereafter, the state retains the ultimate burden of proving adequacy of

1    the asserted bar.  *Id*. at 585-86.

2              Petitioner concedes that the Ninth Circuit has held California's contemporaneous

3    objection rule to be independent and adequate on various occasions, affirming the denial of a

4    federal petition on grounds of procedural default where there was a failure to object to at trial.

5    *E.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th cir. 2005); *Paulino v. Castro*, 371 F.3d

6    1083, 1092-93 (9th Cir. 2004) (jury instruction claim procedurally barred for failure to object);

7    *Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002) (citing *Garrison v. McCarthy*, 653 F.2d

8    374, 377 (9th Cir. 1981); *Vansickel v. White*, 166 F.3d 953, 957 (9th Cir. 1999); *Bonin v.

9    Calderon*, 59 F.3d 815, 842-43 (9th Cir. 1995).  Nevertheless, petitioner urges this court to find

10   the rule neither independent nor adequate in this case and to reach the merits of petitioner's

11   claim.

12             In petitioner's case, the rule was applied independently of federal law, as it arose

13   explicitly from state law and no threshold federal analysis was required.  Despite petitioner's

14   allegations to the contrary, it appears that the rule was also well established and consistently

15   applied at the time period in question.  In particular, petitioner alleges that California courts have

16   not applied the contemporaneous objection rule consistently because an exception to the general

17   rule exists under section 1259 of the California Penal Code.  Petitioner argues that counsel's

18   failure to object was excused by application of section 1259.  As will be discussed, however,

19   section 1259 did not apply to petitioner's case.

20             Section 1259 provides:

21        Upon an appeal taken by the defendant, the appellate court may,
          without exception having been taken in the trial court, review any
22        question of law involved in any ruling, order, instruction, or thing
          whatsoever said or done at the trial or prior to or after judgment,
23        which thing was said or done after objection made in and
          considered by the lower court, and which affected the substantial
24        rights of the defendant.  *The appellate court may also review any
          instruction given, refused, or modified, even though no objection
25        was made thereto in the lower court, if the substantial rights of the
          defendant were affected thereby.*

26

1  Cal. Penal Code § 1259 (emphasis added).  "Substantial rights" in this context "are equated with

2  error resulting in a miscarriage of justice..."  *People v. Arredondo*, 52 Cal.App.3d 973, 978

3  (1975) (citing *People v. Watson*, 46 Cal.2d 818 (1956)).

4          Petitioner urges this court to find the contemporaneous objection rule inadequate

5  in his case based on the statutory exception of section 1259 to the general rule.  In order to meet

6  his burden of contesting the adequacy of the bar, petitioner must "assert[ ] specific factual

7  allegations that demonstrate the inadequacy of the state procedure, including citation to authority

8  demonstrating inconsistent application of the rule."  *Bennett*, 322 F.3d at 586.

9          First, it is important to note that the court of appeal did not actually apply section

10  1259 to excuse petitioner's default.  Rather, the court held that unequivocally that the claim was

11  *not* preserved for appeal.  *People v. Stayer*, *supra*, at 8.  Although the court did not explicitly find

12  that petitioner's substantial rights were unaffected by the alleged instructional error, it effectively

13  did so by virtue of its finding that petitioner's claim would be without merit even if it were not

14  procedurally barred.  *People v. Stayer*, *supra*, at 8 (describing the claim as without citation to

15  authority and based on "unfounded speculation").

16          Citing several unpublished district court opinions, petitioner asserts that "where §

17  1259 has been argued in federal district courts in California, the courts have frequently reached

18  the merits of the claim by relying on § 1259."  (*See* Brief in Support of Traverse, Doc. 39, at 19.)

19  In those cited district court cases, however, the state court of appeal had itself relied on section

20  1259 to find no procedural bar and to reach the merits of the claim.  As discussed, that is not the

21  case here.  The distinction is an important one.

22          As support for his contentions, petitioner cites *People v. Tate*, in which the

23  California Supreme Court relied on section 1259 as a basis for reviewing the defendant's claim

24  regarding deficient jury instructions, despite the lack of objection at trial:

25          [Defendant] challenges the unwarranted first degree murder
            instructions given at his trial, a claim we may review even though
26          he did not object to the instructions below. (§ 1259; see *Moon*,

*supra,* 37 Cal.4th 1, 28, 32 Cal.Rptr.3d 894, 117 P.3d 591.)
Because the forfeiture issue is close and difficult, we decline to
find that defendant forfeited his claim. (*Champion, supra,* 9
Cal.4th 879, 908, fn. 6, 39 Cal.Rptr.2d 547, 891 P.2d 93.)

*People v. Tate,* 49 Cal.4th 635, 697 n.33 (2010).

Since *Tate* was decided several years after petitioner's default in 2006, the case is

not particularly relevant to the issue at hand.  *See Ford v. Georgia,* 498 U.S. 411, 423-34 (1991);

*see also Fields v. Calderon*, 125 F.3d 757, 760 (9th Cir. 1997) ("[T]he proper time for

determining whether a procedural rule was firmly established and regularly followed is the time

of [the] purported procedural default.")  Petitioner notes that the *Moon* and *Champion* cases cited

by the *Tate* court were decided in 2005 and 1995, respectively, prior to his default in 2006.

Review of those cases provides no support for petitioner's contentions.  They neither cite section

1259 nor demonstrate an inconsistent application of the contemporaneous objection rule.  *See*

*Moon*, 37 Cal.4th at 28 (applying the doctrine of "invited error" and finding that  review was not

precluded where counsel "only acquiesced" in an alleged improper instruction); *see also*

*Champion*, 9 Cal.4th at 908 and n.6 (assuming for the sake of argument that had defendants

preserved their right to challenge a jury instruction as improperly given and noting that the

question was "close and difficult" because it was unclear whether an objection by one defendant

was abandoned and also unclear whether another defendant had joined in the objection).

In another case cited by petitioner which explicitly relied on section 1259 to reach

a claim of instructional error despite the lack of objection at trial, the California Supreme Court

held:

According to the Attorney General, defendant has waived this
argument because defendant did not object in the trial court to the
instruction. The Attorney General relies upon the principle that "[a]
party may not complain on appeal that an instruction correct in law
and responsive to the evidence was too general or incomplete
unless the party has requested appropriate clarifying or amplifying
language. [Citation.]" (*People v. Lang*) (1989) 49 Cal.3d 991, 1024
[264 Cal.Rptr. 386, 782 P.2d 627].) Defendant's claim, however, is
that the instruction is *not* "correct in law," and that it violated his

1        right to due process of law; the claim therefore is not of the type
that must be preserved by objection. (§ 1259 ["The appellate court
2        may ... review any instruction given, ... even though no objection
was made thereto in the lower court, if the substantial rights of the
3        defendant were affected thereby."]; *People v. Flood* (1998) 18
Cal.4th 470, 482, fn. 7 [76 Cal.Rptr.2d 180, 957 P.2d 869].)

4

5  *People v. Smithey*, 20 Cal.4th 936, 976 n.7 (1999).  In *Smithey*, the defendant claimed that a

6  legally inaccurate instruction had been given, not that the instructions were simply too general or

7  incomplete.  In petitioner's direct appeal, by contrast, the court specifically noted petitioner "does

8  not argue that the instructions were incorrect, only that they were unclear or incomplete."  *People*

9  *v. Stayer*, *supra*, at 8.  For this reason, *Smithey* and *Tate* are distinguishable and do not

10  demonstrate inconsistency in the application of the contemporaneous objection rule to a case

11  such as petitioner's, in which it is not claimed on appeal but not that instructions were legally

12  inaccurate, but rather, that they were merely confusing or unclear.

13          The distinction between petitioner's case and one in which legally inaccurate

14  instructions are given is significant.  As explained by the California Supreme Court in an opinion

15  filed June 19, 2006, approximately two months before petitioner's default:

16        "Generally, a party may not complain on appeal that an instruction
correct in law and responsive to the evidence was too general or
17        incomplete unless the party has requested appropriate clarifying or
amplifying language." (*People v. Andrews* (1989) 49 Cal.3d 200,
18        218, 260 Cal.Rptr. 583, 776 P.2d 285.) But that rule does not apply
when, as here, the trial court gives an instruction that is an
19        incorrect statement of the law. (*People v. Smithey* (1999) 20
Cal.4th 936, 976, fn. 7, 86 Cal.Rptr.2d 243, 978 P.2d 1171; *People*
20        *v. Frazer* (2003) 106 Cal.App.4th 1105, 1116, fn. 5, 131
Cal.Rptr.2d 319.

21

22  *People v. Hudson*, 38 Cal.4th 1002, 1011-12 (2006).

23          Neither the "general" nature of California's contemporaneous objection rule, as

24  explained above by the California Supreme Court in *Hudson*, nor the fact that exceptions exist,

25  such as that of section 1259, prohibit a finding of adequacy.  *See Beard v. Kindler*, 130 S. Ct.

26  612, 618 (2009) (facially discretionary state procedural rules are not automatically inadequate);

see also Morales v. Calderon, 85 F.3d 1387, 1392 (9th Cir. 1996) ("[P]rocedural rules need not be utterly mechanical. That the application of a rule requires the exercise of discretion does not render the rule inadequate to support a state decision.").

The adequacy requirement is designed to protect petitioners' rights to raise constitutional claims by providing clear notice of what they must do to raise those claims. See Bargas v. Burns, 179 F.3d 1207, 1212 (9th Cir. 1999) (A procedural bar must be "sufficiently clear as to put a petitioner on notice that he must raise all claims or risk default....") Accordingly, exceptions to the contemporaneous objection rule that would not have been employed to excuse petitioner's default, such as the exception set forth in section 1259 for errors affecting substantial rights, and the exception for instructions that give legally inaccurate descriptions of the law, are simply not relevant to the determination being made here.

In sum, petitioner fails to make specific allegations or cite authority demonstrating that California's contemporaneous objection rule was inconsistently applied during the relevant time period. Bennett, 322 F.3d at 586. To the contrary, it appears that California courts have consistently applied the rule to bar claims of instructional error where it is claimed that the instructions were unclear, incomplete, or confusing, as opposed to being legally incorrect in violation of due process or other substantial rights. The contemporaneous objection rule applied by the California Court of Appeal to bar petitioner's instructional error claim should be found to be independent of the federal question and adequate to support the judgment.

Such a default bars petitioner's claim of instructional error unless he shows cause and prejudice. Murray v. Carrier, 477 U.S. 478, 485 (1986) ("[A] federal habeas petitioner who has failed to comply with a State's contemporaneous-objection rule at trial must show cause for the procedural default and prejudice attributable thereto in order to obtain review of his defaulted constitutional claim.") (citing Wainwright v. Sykes, 433 U.S. 72, 87 (1977)). Satisfying "cause" requires a petitioner to show that some objective factor external to the defense impeded his effort to comply with California's untimeliness rule. McCleskey v. Zant, 499 U.S. 467, 493 (1991).

23

1  Petitioner fails to demonstrate cause under this standard.  Since cause is not shown, this court

2  need not address the issue of prejudice.  *See Smith v. Murray*, 447 U.S. 527, 533 (1986).

3         Petitioner further fails to demonstrate that a fundamental miscarriage of justice

4  will result if his claim is not reviewed.  *See McCleskey*, 499 U.S. at 494 (describing the standard

5  as "extraordinary instances when a constitutional violation probably has caused the conviction of

6  one innocent of the crime").  Petitioner's is not one of those extraordinary cases.  Accordingly,

7  this court is precluded from reviewing the merits of petitioner's procedurally defaulted claim.

8  *See Sawyer v. Whitley*, 505 U.S. 333, 338 (1992).

9
       C.    Ground Three- Prosecutorial Misconduct, Ineffective Assistance, and the
10            Marital Privilege

11        At the preliminary hearing, the magistrate ruled that Kimberly could not assert a

12  marital privilege because her marriage to Robert was void.  Under a grant of immunity in

13  exchange for her testimony, she testified at the preliminary hearing and at trial.  Petitioner

14  contends that the prosecutor committed prejudicial misconduct when he represented to the trial

15  court that Kimberly's marriage to Robert was still not valid at the time of trial, and also that his

16  trial counsel rendered ineffective assistance in failing to discover that the marriage had become

17  valid and to raise an objection.

18        The California Court of Appeal described and rejected petitioner's claim in this

19  regard as follows:

20        ***Background***

21        On January 11, 2005, at the preliminary hearing (Judge William
          Gallagher presiding), Kimberly testified that she "was supposedly
22        married to" Robert on June 30, 2004, in Nevada, and lived with
          him thereafter. Judge Gallagher permitted voir dire on her marital
23        status.

24        Asked why she thought herself unmarried, Kimberly answered: "I
          was told that [Robert]'s still married." Though she "considered"
25        herself married, the prosecutor had told her that she could not
          assert the marital privilege.

26

Once Kimberly had identified Amanda Meridith as Robert's "separated wife," the prosecutor proffered the family law court file in the pending case *Meridith v. Stayer*. He asked Judge Gallagher to judicially notice that the file did not contain a "final order of dissolution," which proved that Robert's and Kimberly's marriage was void.[FN29]

> FN29. The prosecutor mistakenly cited Family Code section 2210, which deals with voidable marriages. The controlling statute is Family Code section 2201, which provides in part: "(a) A subsequent marriage contracted by a person during the life of a former husband or wife of the person, with a person other than the former husband or wife, is illegal and void from the beginning, unless: [¶] (1) The former marriage has been dissolved or adjudged a nullity before the date of the subsequent marriage."

After inspecting the file, Judge Gallagher asked Robert's counsel: "Is there any real dispute about the fact that that's still an intact marriage?" Counsel replied: "Not that I know of." Counsel could not cite any authority that Robert's and Kimberly's marriage might be merely voidable.

Judge Gallagher ruled: "The Court determines that the witness is not legally married to Robert Stayer because his prior marriage has not been dissolved."

Judge Gallagher appointed counsel to advise Kimberly about testifying.[FN30] After reaching a written agreement with the prosecutor, she resumed the stand and testified at length.

> FN30. Robert's counsel expressed concerns about Kimberly's possible implication in the crimes charged in counts 5 and 6 and her possible liability for entering into a bigamous marriage.

Jury trial (Judge Stephen Baker presiding) began on July 19, 2006. No party renewed the issue of Kimberly's marital status at trial.

In this court, defendants requested judicial notice of the court file in *Meridith v. Stayer* (Shasta County Sup.Ct., Case No. 149249) and of Robert's and Kimberly's marriage certificate dated June 30, 2004. We granted the request. The court file shows that a final judgment of dissolution was entered on July 27, 2005 (after the preliminary hearing, but before trial) nunc pro tunc to February 20, 2004 (before Robert's and Kimberly's marriage ceremony).[FN31]

> FN31. At a hearing on March 9, 2005, the parties stipulated to February 20, 2004, as the date for a nunc pro tunc judgment of dissolution. The family court granted a motion

25

to bifurcate issues and ruled that judgment could be entered nunc pro tunc to that date.

### Analysis

Defendants contend that because *on July 27, 2005,* the family court entered judgment of dissolution in *Meridith v. Stayer* nunc pro tunc to February 20, 2004, Robert's and Kimberly's marriage was valid when entered into on June 30, 2004. Therefore, they maintain, Judge Gallagher erred *on January 11, 2005,* by finding the marriage void and barring Kimberly from asserting the marital privilege- *even though the nunc pro tunc judgment of dissolution had not yet been entered.* Moreover, they maintain, the prosecutor committed misconduct by asking Judge Gallagher to judicially notice that the file in *Meridith v. Stayer* did not contain any order or judgment of dissolution, and trial counsel provided ineffective assistance by failing to object- *even though the file did not then contain any such order or judgment.* On these facts, the argument is specious.

But even if a nunc pro tunc judgment of dissolution had been entered by the preliminary hearing, the argument would still fail. Only a validly married person may assert the marital privilege. (Evid.Code, § 970; *People v. Glab* (1936) 13 Cal.App.2d 528, 532-536, 57 P.2d 588 [bigamous spouse cannot do so].) Entering a judgment of dissolution nunc pro tunc does not retroactively validate a marriage which was bigamous when entered into. (*Corbett v. Corbett* (1931) 113 Cal.App. 595, 598-599, 298 P. 819; see *In re Marriage of Campbell* (2006) 136 Cal.App.4th 502, 504, 38 Cal.Rptr.3d 908. Cf. § 281; Fam.Code, § 2201.) Therefore, as the magistrate ruled, Kimberly could not assert the marital privilege.

Because the magistrate's ruling was clearly correct, trial counsel's failure to make a meritless contrary argument was not ineffective assistance. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1038, 108 Cal.Rptr.2d 291, 25 P.3d 519.)

*People v. Stayer*, *supra*, at 8-10.

The appropriate standard for a federal court reviewing a claim of prosecutorial misconduct on habeas corpus is the narrow one of whether the conduct violated due process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "The relevant question is whether the prosecutor's error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1983) ("the touchstone of due

26

1   process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

2   culpability of the prosecutor").

3          Factors to be considered in determining whether habeas relief is warranted include

4   whether the prosecutor manipulated or misstated the evidence; whether the conduct implicated

5   other specific rights of the accused; whether the objectionable content was invited or provoked

6   by defense counsel's argument; whether the trial court admonished the jurors; and the weight of

7   the evidence against the defendant. *Darden*, 477 U.S. at 181-82.  Relief is limited to cases in

8   which the petitioner can establish that the misconduct resulted in actual prejudice. *See Johnson*

9   *v. Sublett*, 63 F.3d 926, 930 (1995) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38).  In

10  other words, prosecutorial misconduct in violation of due process warrants habeas corpus relief

11  only if it had a "substantial and injurious effect or influence in determining the jury's verdict."

12  *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004) (applying *Brecht's* "harmless error" test in

13  evaluating a claim of prosecutorial misconduct on habeas corpus).

14         Initially, it is noted that petitioner makes a substantial showing that the court of

15  appeal erred and misconstrued California law at the relevant time when it indicated that

16  "[e]ntering a judgment of dissolution nunc pro tunc does not retroactively validate a marriage

17  which was bigamous when entered into."[21]  *People v. Stayer*, *supra*, at 10.  Petitioner devotes a

18  substantial portion of argument in both his brief supporting the petition and the brief supporting

19  his traverse attempting to demonstrate that, under California law at the time of trial, Kimberly

20  had a valid marital privilege to exercise which she did not waive by testifying at the preliminary

21  hearing.  Respondent contends that the effort is futile since a court sitting in federal habeas

22  corpus is generally bound a state court's interpretation and application of state law, including one

23  announced on direct appeal.  *See Richey*, 546 U.S. at 76.  Petitioner responds that this error of

24  state law is "subsumed in the analysis of the prosecutorial and ineffective assistance claims, both

25

26        [21] In particular, it appears that the state appellate court relied on case law that had been
      superseded by a statutory change, as discussed *infra* in footnote 23.

1    of which are federal claims..." (Brief in Support of Traverse, Doc. 39 at 63.) The Ninth Circuit

2    has held that "[i]f a state law issue must be decided in order to decide a federal habeas claim, the

3    state's construction of its own law is binding on the federal court." *Horton v. Mayle*, 408 F.3d

4    570, 576 (9th Cir. 2005). In this case, however, the relevant state court decision did not

5    announce or interpret state law as a matter of first impression on direct appeal in this case; rather,

6    the court of appeal failed to adhere to the California Supreme Court's construction of state law.

7             This point of contention need not be decided here. Even assuming, solely for

8    purposes of this discussion, that Kimberly's marriage to Robert was valid at the time of trial, and

9    that Kimberly had a valid marital privilege to assert at that time, the claim of prosecutorial

10   misconduct still fails. The prosecutor's conduct of which petitioner complains includes the filing

11   of a pre-trial brief and representations to Kimberly, and later to the trial court, that Kimblery had

12   no valid marital privilege to invoke at the time of trial.[22] As discussed below, such conduct did

13   not render petitioner's trial unfair in violation of due process.

14           Just prior to trial, on July 6, 2006, the prosecutor filed "Trial Brief re: Kimberly

15   Stayer Refusal to Testify: Contempt." (Clerk's Transcript ("CT") at 1456-62.) The basis of the

16   brief was the prosecutor's suspicion that Kimberly was going to attempt to invoke the marital

17   privilege at trial. The prosecutor indicated that his suspicion was based on recorded jail

18   telephone calls between Kimberly and Robert. The prosecutor submitted the brief "to address the

19   following issues in anticipation of Kimberly Stayer following through with her stated intent of

20   violating her informal immunity agreement and asserting a privilege." The prosecutor requested

21   that the court cite Kim for contempt if she refused to testify at trial. The prosecutor's brief cited

22   relevant California law including the law set forth in the following paragraph.

23   /////

24   _____

25   [22] Although these allegations were raised on appeal, the court of appeal did not explicitly address them, instead focusing on the prosecutor's accurate representations regarding the marital privilege issue at the preliminary hearing to find that no misconduct or ineffective assistance

26   occurred. *See People v. Stayer*, *supra*, at 8-10.

Under sections 970 and 971 of the California Evidence Code, a married person has a privilege not to testify against her spouse in any proceeding and has a privilege not to be called as an adverse witness in any proceeding to which her spouse is a party. Under section 973, however, a married person who testifies against her spouse in a proceeding, unless erroneously compelled to do so, waives the marital privilege for that proceeding. Additionally, under section 972, a married person has no privilege in

> [a] proceeding resulting from a criminal act which occurred prior to legal marriage of the spouses to each other regarding knowledge acquired prior to that marriage if prior to the legal marriage the witness spouse was aware that his or her spouse had been arrested for or had been formally charged with the crime or crimes about which the spouse is called to testify.

Cal. Evid. Code § 972. The privilege not to testify is the spouse witness's privilege. *People v. Villarino*, 7 Cal.App.3d 56, 62 n.1 (4th Dist. 1970). The privilege is held by the witness spouse and may not be claimed or invoked by the defendant spouse or any other person. *People v. McWhorter*, 47 Cal.4th 318 (2009) ("spousal privilege is personal to the spouse seeking to avoid testifying," thus "defendant does not have standing to raise the claim"); *see also People v. Resendez*, 12 Cal.App.4th 98, 110 n.7 (1993). [23]

---

[23] Kimberly and Robert were married on June 30, 2004, prior to the date of the offenses in question, which occurred on November 21, 2004. (Supplemental Clerk's Transcript ("CT") at 10-13; *see also* Reporter's Transcript (*"RT"*) at 1187.) Robert obtained a dissolution of his previous marriage on July 27, 2005. The dissolution was entered nunc pro tunc, retroactive to February 20, 2004.

Contrary to the state appellate court's indication, petitioner demonstrates that in California, the nunc pro tunc statute allows a marriage to be dissolved retroactively where the dissolution should have been granted but was not because of mistake, negligence or inadvertence. Petitioner further demonstrates that his dissolution was entered nunc pro tunc to February 20, 2004. A nunc pro tunc judgment gives the parties the same rights with regard to the dissolution of marriage as if it had become final the date when it could or should have originally been entered. *See* Family Code § 2346. The purpose of the statute, which was enacted in 1935, subsequent to the *Corbett* decision cited and relied on by the state appellate court in rejecting petitioner's claim on direct appeal, was to "validate otherwise void marriages and thus relieve the parties to such marriages from the stigma and other consequences of bigamous relationships into which they might innocently fall by reason of oversight or neglect to have a final decree entered." *Adoption of Graham*, 58 Cal.2d 899, 904 (1962) (citing *Estate of Hughes*, 80 Cal.App.2d 550,

1      Later that day, the trial court discussed with the parties the prosecutor's brief that

2   was filed that morning.  The prosecutor agreed with the trial court that the issue was not yet ripe

3   and so the issue was not reached.  (RT at 206-07.)  *No party renewed the issue of Kim's marital*

4   *status at trial*; this was a finding explicitly made by the state court of appeal (*People v. Stayer*,

5   supra, at 9) which has not been rebutted with clear and convincing evidence.

6      It is of note is that, under California law, neither the trial court, nor any party to a

7   criminal proceeding, need advise a witness of the privilege not to testify, nor the loss of the

8   privilege once testimony is given in order for the privilege to be "waived" by the witness giving

9   testimony.  In addition, the privilege not to testify against a spouse has been held by the

10   California courts to be not constitutionally mandated or protected.  *Resendez*, 12 Cal.App.4th at

11   108-09.

12      In this case, the privilege at issue was not held by petitioner, nor was he even a

13   party to the marriage upon which it was based.  Under these circumstances, the prosecutor's

14   conduct with respect to Kimberly's marital privilege based on her marriage to Robert did not

15   render petitioner's trial fundamentally unfair in violation of due process.  Petitioner fails to

16   demonstrate that he is entitled to relief for the prosecutor's alleged "misconduct."

17      Petitioner's ineffective assistance of counsel claim premised on Kimberly's

18   marital privilege likewise fails.  To demonstrate a denial of the Sixth Amendment right to the

19   _____

20   553 (2nd Dist. 1947)).

21      Petitioner contends that Kimberly could not have waived her privilege under section 973
     by testifying at the preliminary hearing on January 11, 2005 because her marriage had not yet

22   become retroactively valid, and thus she had no privilege to waive at that point in time.
     Petitioner also presumably contends that section 972 did not bar assertion of her privilege

23   because once Robert's dissolution was entered nunc pro tunc, his marriage to Kimberly was
     retroactively validated effective June 30, 2004.  It thus appears that petitioner wants the court to

24   find that Robert and Kimberly were validly married when the offenses occurred for purposes of
     section 973, by virtue of the nunc pro tunc dissolution, but not validly married at the time of the

25   preliminary hearing, for purposes of section 972, despite his argument that the nunc pro tunc
     statute operated to retroactively validate the marriage.  These arguments appear to be inconsistent

26   and possibly mutually exclusive.  In any event, it is not necessary to reach these issues of state
     law in order to decide the federal claim presented.

1  effective assistance of counsel, a petitioner must establish that counsel's performance fell below

2  an objective standard of reasonableness, and that he suffered prejudice from the deficient

3  performance. *Strickland v. Washington*, 466 U.S. 668, 690 (1984). Prejudice is found where

4  there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

5  proceeding would have been different. *Id*.

6        In this case, petitioner concedes he was not the holder of the marital privilege. He

7  nevertheless contends his attorney's status as an officer of the court "gave him standing to raise

8  the necessity for the trial court to make its own factual finding on whether Rob's dissolution had

9  been entered nunc pro tunc, and to make the court aware that the effect of the nunc pro tunc

10  statute would have been to restore the validity of the marriage." (Brief in Support of Traverse,

11  Doc. 39 at 66.) To find that counsel had no duty to do so, petitioner asserts in this claim, is an

12  unreasonable application of the *Strickland* standard. Elsewhere in his filings, however, petitioner

13  concedes that "[c]ounsel for Tim Stayer was correct that he had no standing to object to the

14  rulings on either of the privileges." (Brief in Support of Petition, Doc. 28 at 75.)

15        The state appellate court found that "trial counsel's failure to make a meritless

16  contrary argument [regarding Kim's privilege] was not ineffective assistance." *People v. Stayer*,

17  *supra*, at 10. Since the state court reached a decision on the merits, it would be error for this

18  court to review the claim de novo. *See Harrington v. Richter*, 131 S.Ct. 770, 784-85 (2011). It

19  does not matter that the state court did not advance reasoning for the denial of the claim with

20  respect to petitioner's specific allegations about trial counsel's performance at trial, as opposed to

21  at the preliminary hearing. *See Id*. (holding that section 2254(d) should still be applied to a state

22  court decision on the merits even in the absence of a statement of reasoning). The Supreme

23  Court recently stressed that "[t]he pivotal question is whether the state court's application of the

24  *Strickland* standard was unreasonable," which is different from asking whether defense counsel's

25  performance fell below *Strickland*'s standard." *Richter*, 131 S.Ct. at 788. The court must ask

26  not "whether counsel's actions were reasonable" but whether there is any reasonable argument

31

1    that counsel satisfied *Strickland*'s deferential standard." *Id*.  In reviewing defense counsel's

2    performance, courts "must be highly deferential" and make "every effort... to eliminate the

3    distorting effects of hindsight." *Strickland*, 466 U.S. at 689.

4           Under the circumstances of this case, a reasonable argument exists that counsel

5    satisfied *Strickland*'s deferential standard where his client had no right to assert the privilege at

6    issue, nor was he the spouse of the person to whom the marital privilege at issue belonged.  This

7    is especially true considering the state court's factual finding that no party raised the marital

8    privilege at trial.  Any attempt by petitioner's counsel to assert Kimberly's privilege or to object

9    to her testimony on this ground would have been futile.  Petitioner fails to demonstrate

10   entitlement to relief based on the issue of Kimberly's marital privilege.

11

12          D.      Ground Four- Involuntary Testimony, Due Process, and Ineffective
                    Assistance

13          Petitioner further claims that trial counsel failed to object to Kimberly's testimony

14   as involuntary and coerced and a violation of his due process right to a fair trial.  In support of

15   this claim, petitioner submits a declaration of trial counsel Timothy R. Pappas, in which counsel

16   states he did not object to Kimberly's testimony at trial because it "did not occur" to him "that

17   Tim Stayer would have had standing to object to Kim Stayer's testimony as involuntary in

18   violation of the due process clause of the U.S. Constitution."  (Petition, Exhibit G.)

19          This claim was not raised on direct appeal; rather, appointed counsel for this

20   federal proceeding first raised the issue in a petition for writ of habeas corpus to the California

21   Supreme Court on or about December 14, 2009.  The California Supreme Court summarily

22   denied the petition without written explanation on March 18, 2010.  Respondent contends that

23   this claim was untimely filed in state court, and that it is both time barred *and* procedurally

24   barred in this court.

25          As previously discussed, federal courts will generally not review a question of

26   federal law decided by a state court where the decision rests on a state law ground, such as a

1   procedural bar, if that ground is independent of the federal question and adequate to support the

2   judgment. *See Coleman,* 501 U.S. at 750. This claim, however, should not be found to be

3   procedurally defaulted. When the California Supreme Court denies a habeas petition without

4   comment or citation, as it did in this case, the Ninth Circuit has long treated the denial as a

5   decision on the merits. *See, e.g., Hunter v. Aispuro,* 982 F.2d 344, 348 (9th Cir. 1992) ("[W]e

6   conclude that the California Supreme Court's summary order denying Hunter's petition was a

7   denial on the merits of Hunter's constitutional claims, and not a denial on a state procedural

8   ground."). The state court decision on the merits was not clearly independent of federal law.

9           Regarding timeliness, section 2244(d)(1) imposes a one-year limitation period for

10  a state prisoner to file a federal habeas corpus petition. Absent any tolling, petitioner's one year

11  period expired to file his federal claim expired on December 23, 2009. The second amended

12  petition containing this claim was not filed until March 24, 2010. Petitioner contends, however,

13  that he is entitled to statutory tolling for the time period from December 14, 2009, when his state

14  habeas corpus petition was filed, until March 18, 2010, when it was denied by the Supreme

15  Court.

16          The limitations period is statutorily tolled while a "properly filed" application for

17  habeas corpus review is pending in state court. *See* 28 U.S.C. § 2244(d)(2). Only a timely filed

18  petition is "properly filed" for purposes of tolling the limitations period. *Pace v. DiGuglielmo*,

19  544 U.S. 408, 417 (2005). The United States Supreme Court has observed that, under California

20  law, a habeas corpus petition is timely if it is filed within a "reasonable time." *Evans v. Chavis*,

21  546 U.S. 189, 198 (2006); *see also Waldrip v. Hall*, 548 F.3d 729, 734 (9th Cir. 2008). The

22  United States Supreme Court has further observed that California courts have provided little

23  guidance as to what the state considers a "reasonable" length of time in this context. *Evans*, 546

24  U.S. at 198.

25          Statutory tolling clearly does not apply where the state court dismissed a petition

26  as untimely. *Nino v. Galaza*, 183 F.3d 1003, 1006 n.4 (9th Cir. 1999). Where the state court has

issued a summary denial without explanation, as in this case, however, the federal court must "itself examine the delay in each case and determine what the state courts would have held in respect to timeliness," i.e., whether the filing was made within what California would consider a "reasonable time." *Evans*, 546 U.S. at 198.

Here, the California Supreme Court did not explicitly find or assert a time bar with respect to petitioner's claim, which at least suggests that it considered the petition timely filed. It is of note that "[t]he California Supreme Court also did not cite to any case law in support of the dismissal of the petition, as it often does when rejecting an untimely petition." *Maxwell v. Roe*, 628 F.3d 486, 496 (2010); *see also, e.g., Cooper v. Brown*, 510 F.3d 870 (9th Cir. 2007) (noting that the California Supreme Court had denied claims as untimely with citation to *In re Clark*, 5 Cal.4th 750 (1993) and *In re Robbins*, 18 Cal.4th 770 (1998)). Although the California Supreme Court's summary disposition of petitioner's claim in this manner is not dispositive of the issue, it is a factor to be considered. *Maxwell*, 628 F.3d at 496 (citing *Evans*, 546 U.S. at 194).

Petitioner's justification in his state petition for the delay should also be considered. *See Maxwell*, 628 F.3d at 496; *see also Chaffer v. Prosper*, 592 F.3d 1046, 1048 (9th Cir. 2010) (citing *In re Swain*, 34 Cal.2d 300 (1949).

In the applicable state petition, it was alleged regarding the delay that:

> Petitioner's trial attorney, Timothy Pappas, did not object to Kim's erroneously ordered testimony because his legal opinion was that petitioner had no standing to object to the privilege ruling... But Mr. Pappas failed to recognize that he could have objected to Kim's testimony as involuntarily given, and could have relied on due process grounds to do so... During the week of November 23, 2009, federal habeas counsel determined that the issue could have been raised as a due process violation based on involuntary testimony, and promptly informed petitioner of this in a personal interview conducted on or about December 4, 2009, at High Desert State Prison. At that time petitioner authorized federal habeas counsel to prepare and file the instant writ petition in the California Supreme Court.

(Respondent's Exhibit 15 at 9.)

34

1    Under California law, in "assessing a petitioner's explanation and justification for

2   delayed presentation of claims," a court can "consider whether the facts on which the claim is

3   based, although only recently discovered, could and should have been discovered earlier.  A

4   petitioner will be expected to demonstrate due diligence in pursuing potential claims."  *In re*

5   *Clark*, 5 Cal.4th at 775.  In *Robbins*, the California Supreme Court further explained:

6        Substantial delay is measured from the time the petitioner or his or
         her counsel knew, or reasonably should have known, of the
7        information offered in support of the claim and the legal basis for
         the claim. A petitioner must allege, *with specificity,* facts showing
8        when information offered in support of the claim was obtained, and
         that the information neither was known, nor reasonably should
9        have been known, at any earlier time. It is not sufficient simply to
         allege in general terms that the claim recently was discovered, to
10       assert that second or successive postconviction counsel could not
         reasonably have discovered the information earlier, or to produce a
11       declaration from present or former counsel to that general effect. A
         petitioner bears the burden of *establishing*, through his or her
12       specific allegations, which may be supported by any relevant
         exhibits, the absence of substantial delay.
13

14   In re Robbins 18 Cal.4th at 780 (emphasis in original).

15       In this case, Kim's testimony at trial was given in 2006, the same year of

16   petitioner's conviction.  It was at that time that he or his counsel should have known about the

17   facts on which this claim is based.  The state petition raising the claim was not filed until more

18   than three years later.  Such delay was not justifiable.

19       The Ninth Circuit recently observed, regarding delay:

20       The Supreme Court has previously opined that California courts
         would not consider an unjustified and unexplained six-month delay
21       "reasonable." *Id.* at 201, 126 S.Ct. 846. Further, the Court has
         permitted interval tolling under California's unusual system of
22       habeas petitions and imprecise time limits on the assumption "that
         California's 'reasonable time' standard would not lead to filing
23       delays substantially longer than those in States with determinate
         timeliness rules." *Id.* at 199-200, 126 S.Ct. 846 (citing *Saffold,* 536
24       U.S. at 222-23, 122 S.Ct. 2134). *Chavis* presumed a 30- or 60-day
         delay would be the norm in most states, 546 U.S. at 193, 201, 126
25       S.Ct. 846; *Saffold* only 30 to 45 days, 536 U.S. at 222, 122 S.Ct.
         2134. Banjo waited 146 days. We cannot conclude that such a
26       delay is reasonable, nor is it consistent with the short periods of

35

1    time permitted by most states and envisioned by the Supreme
     Court in reaching its decisions in *Saffold* and *Chavis.*

2

3    *Banjo v. Ayers*, 614 F.3d 964, 970 (2010); *see also Evans*, 546 U.S. at 190 (delay of three years

4    and one month based on lack of access to prison law library was not reasonable).

5             Based on the foregoing, it appears that a California court considering the issue

6    would not have found petitioner's delay reasonable.  Petitioner is not entitled to statutory tolling

7    for the period of time that his state petition for writ of habeas corpus was pending.  Accordingly,

8    ground four of the pending federal petition was untimely filed and its merits need not be reached.

9             In any event, the merits of this claim would not warrant relief.  In particular,

10   petitioner fails to demonstrate that the state court's decision was an unreasonable application of

11   clearly established Supreme Court precedent.  To the contrary, at least one circuit has held,

12   without correction from the Supreme Court, that admission of evidence covered by the marital

13   privilege can never rise to the level of a due process violation and therefore cannot form the a

14   basis for habeas corpus relief.  *See Byrd v. Armontrout*, 880 F.2d 1, 9-10 (8th Cir. 1989) (holding

15   that misapplication of a marital privilege cannot rise to the level of a due process violation

16   because "[t]he policies furthered by proper application of the marital privilege in any of its forms

17   are quite distinct from the concerns for fairness and reliability protected by the Due Process

18   Clause.  Thus Byrd's argument that the privilege was misapplied, even if it were correct, would

19   not establish a constitutional due process violation."), cert. denied 494 U.S. 1019 (1990).

20             E.      Ground Five- Instructional Error and Jury Unanimity

21             Petitioner next claims that the trial court failed to give a unanimity instruction

22   directing the jury it must agree on the acts on which the guilty verdicts were based.  Petitioner

23   sets forth multiple acts upon which his various convictions could have been based, and, citing

24   mostly California law, alleges that the trial court's failure to give a unanimity instruction violated

25   due process.

26   /////

1         In a lengthy discussion on direct appeal, the state appellate court rejected this

2 claim, finding that a unanimity instruction was not required under state law because "the acts he

3 enumerates constitute a single 'discrete criminal event' or continuous course of conduct as to

4 each count; thus a unanimity instruction was not required." *People v. Stayer*, *supra,* at 11. The

5 court further held that petitioner's "conviction without a unanimity instruction [did not] violate[ ]

6 due process..." *Id*. at 12.

7         As discussed, "the Due Process Clause protects the accused against conviction

8 except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with

9 which he is charged." *In re Winship*, 397 U.S. at 364. Although California requires unanimity

10 from all twelve jurors in a criminal trial (*see* Cal. Const. Art. I, § 16), the Fourteenth Amendment

11 requires neither a twelve-person jury nor a unanimous jury in state criminal trials. *Williams v.*

12 *Florida*, 399 U.S. 78, 86 (1970); *Apodaca v. Oregon*, 406 U.S. 404, 410-413 (1972). Thus, in

13 general, criminal defendants in state court have no federal constitutional right to a unanimous

14 jury verdict. *See Apodaca* , 406 U.S. at 410-12.

15         Moreover, the United States Supreme Court has held that the Constitution does

16 not require unanimous agreement on the theory underlying a murder charge. *See Schad v.*

17 *Arizona*, 501 U.S. 624, 631-32 (1991). In *Schad*, the Court noted generally that its "cases reflect

18 a long-established rule of the criminal law that an indictment need not specify which overt act,

19 among several named, was the means by which a crime was committed." *Id*. at 631. Thus, when

20 a single crime can be committed by various means, the jury need not unanimously agree on

21 which means were used so long as they agree that the crime was committed. *Id*. at 631-32; *see*

22 *also Id.* at 649 (Scalia, J., concurring in judgment) ("it has long been the general rule that when a

23 single crime can be committed in various ways, jurors need not agree upon the mode of

24 commission"); *see also Hoover v. Johnson*, 193 F.3d 366, 369 (5th Cir. 1999) (noting that the

25 Supreme Court has not "explicated a constitutional requirement that state-court juries must agree

26 to a single act that satisfies the overt act element of the relevant crime).

1    Petitioner argues that the California Constitution gives rise to a liberty interest in a

2    unanimous verdict in a criminal trial by (*see* Cal. Const. Art. I, § 16), and therefore that a

3    conviction obtained without jury unanimity violates federal due process.  The Supreme Court has

4    held that, when a state guarantees a structural protection, it violates the Due Process Clause of

5    the federal Constitution if it fails to meaningfully vindicate that guarantee.  *See* U.S. Const.

6    Amend. XIV; *Evitts v. Lucey*, 469 U.S. 387, 400-01 (1985) (holding that because Kentucky

7    allowed criminal appeals, it was required to administer them in a manner consistent with federal

8    due process).  Under the facts of this case, however, there is no indication that California has

9    withdrawn any right or failed to vindicate its unanimous jury guarantee.  Moreover, the argument

10   fails for lack of clearly established Supreme Court precedent.  *See Hoover*, 193 F.3d at 370-71

11   ("There is no suggestion in the Supreme Court's jurisprudence that a state, having established a

12   guarantee of a unanimous jury in felony cases, must vindicate that right in conspiracy trials by

13   requiring that the trial court [] give instructions to the jury, explicit in themselves without regard

14   to the arguments of counsel, that it must agree as to which act in a list of overt acts the defendant

15   had committed before it could find him guilty of conspiracy[.]").  The state court's determination

16   that a unanimity instruction was unnecessary was not unreasonable.[24]

17              F.    Ground Six- Jury Instructions on Natural and Probable Consequences

18       At trial, the jury was instructed on murder and torture as follows:

19       The defendants are charged in Count 3 with torture and in Count [1]
         with murder.  You must first decide whether the defendant is guilty
20       of torture.  If you find the defendant is guilty of this crime you must
         then decide whether he is guilty of murder.  Under certain
21       circumstances, a person who is guilty of one crime may also be
         guilty of other crimes that were committed at the same time.
22
23       To prove that the defendant is guilty of murder, the People must
         prove that, one, the defendant is guilty of torture; two, during the

24

25   [24] Petitioner asserts in the brief in support of his traverse that due process was violated
     because one of the overt acts alleged in the conspiracy count was also alleged as the agreement
     itself.  Arguments raised for the first time in a reply brief need not be considered.  *See Smith v.*
26   *Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

1    commission of the torture the crime of murder was committed; and
     three, under all of the circumstances, a reasonable person in the
2    defendant's position would have known that the commission of
     murder was a natural and probable consequence of the commission
3    of torture.

4    (RT at 1726-27.)

5           Regarding Natural and Probable Consequences, the court instructed:

6           A natural and probable consequence is one that a reasonable person
            would know is likely to happen if nothing unusual intervenes.  In
7           deciding whether a consequence is natural and probable, consider
            all of the circumstances established by the evidence.  If the murder
8           was committed for the reason independent of the common plan to
            commit the torture then the commission of murder was not a
9           natural and probable consequence of torture.  To decide whether
            the crime of murder was committed, please refer to the separate
10          instructions that I will give you on that particular crime.

11   (RT at 1727.)

12          The jury was also instructed on the elements of count two, conspiracy to commit

13   torture.  (RT at 1727-29.)  The jury was instructed that "a member of a conspiracy is also

14   criminally responsible for any act of any member of the conspiracy if that act is done to further

15   the conspiracy and that act is a natural and probable consequence of the common plan or design

16   of the conspiracy."  (RT at 1729.)  The jury was further instructed:

17          To prove that either of the defendants is guilty of the crime charged
            in Count 1, murder, the People must prove that one, the defendant
18          conspired to commit torture; two, a member of the conspiracy
            committed murder to further the conspiracy; and three, murder was
19          the [] natural and probable consequence of the common plan or
            design of the crime that the defendant conspired to commit.
20

21   (RT at 1730.)

22          With respect to the instructions on natural and probable consequences, petitioner

23   contends that the trial court erred by not specifically instructing that the jury it had to find that

24   *first degree murder* (as opposed to a lesser form of murder) was a natural and probable

25   consequence in order to convict on that theory.  Petitioner claims that this omission violated his

26   right to due process and allowed the jury to convict him of first degree murder without proof of

                                                    39

1   every element beyond a reasonable doubt.

2              On direct appeal, the California Court of Appeal held, regarding this claim:

3         Timothy contends that the instructions could have allowed the jury
          erroneously to convict him of first degree murder without finding
4         that that crime (rather than implied malice murder) was a natural
          and probable consequence of the object of any conspiracy Timothy
5         took part in or any act he aided and abetted. He is mistaken.

6         """The general rule is well settled that where several parties
          conspire or combine together to commit any unlawful act, each is
7         criminally responsible for the acts of his associates or confederates
          committed in furtherance of any prosecution of the common design
8         for which they combine.... *Each is responsible for everything done
          by his confederates, which follows incidentally in the execution of*
9         *the common design as one of its natural and probable*
          *consequences, even though it was not intended as a part of the*
10        *original design or common plan.* [Citations.]""" (*People v.*
          *Prettyman* (1996) 14 Cal.4th 248, 260-261, 58 Cal.Rptr.2d 827,
11        926 P.2d 1013 (*Prettyman* ).)

12        "In *People v. Croy* [1985] 41 Cal.3d 1, 221 Cal.Rptr. 592, 710
          P.2d 392, we set forth the principles of the 'natural and probable
13        consequences' doctrine as applied to aiders and abettors: '[An
          aider and abettor] is guilty not only of the offense he intended to
14        facilitate or encourage, but also of any reasonably foreseeable
          offense committed by the person he aids and abets.... [¶] It follows
15        that a defendant whose liability is predicated on his status as an
          aider and abettor need not have intended to encourage or facilitate
16        the particular offense ultimately committed by the perpetrator. His
          knowledge that an act which is criminal was intended, and his
17        action taken with the intent that the act may be encouraged or
          facilitated, are sufficient to impose liability on him for any
18        reasonably foreseeable offense committed as a consequence by the
          perpetrator. It is the intent to encourage and bring about conduct
19        that is criminal, not the specific intent that is an element of the
          target offense, which ... must be found by the jury.' (*Id.* at p. 12, fn.
20        5, 221 Cal.Rptr. 592, 710 P.2d 392.) Thus, under *Croy,* a defendant
          may be held criminally responsible as an accomplice not only for
21        the crime he or she intended to aid and abet (the target crime), but
          also for any other crime that is the 'natural and probable
22        consequence' of the target crime." (*Prettyman, supra,* 14 Cal.4th at
          p. 261, 58 Cal.Rptr.2d 827, 926 P.2d 1013.)

23
          If the trial court instructs on natural and probable consequences, it
24        must "identify[ ] and describ[e] each potential target offense
          supported by the evidence." (*Prettyman, supra,* 14 Cal.4th at p.
25        270, 58 Cal.Rptr.2d 827, 926 P.2d 1013.)

26   /////

1   Citing only *Prettyman,* Timothy asserts that the natural and
    probable consequences instructions here needed to name first
2   degree murder, rather than murder per se, as the target offense. But
    *Prettyman* does not so hold, and we have not found any other case
3   that does. For want of supporting authority, Timothy's contention
    fails. (*Amato v. Mercury Casualty Co., supra,* 18 Cal.App.4th at p.
4   1794, 23 Cal.Rptr.2d 73.)

5   In any event, the trial court instructed on the People's theories of
    first degree murder and directed the jury to consult those
6   instructions in deciding "whether the crime of murder was
    committed[.]" Thus, even if the jury had to be told that the target
7   offense was first degree murder, the instructions sufficiently did so.

8   *People v. Stayer*, *supra*, at 12 -13 (footnote omitted).

9          Respondent asserts the state court found the claim procedurally defaulted for lack

10  of citation to relevant authority and thus that procedural default bars relief in this court.

11  Respondent does not develop the argument further.  Petitioner responds that state court's finding

12  of relevant authority should be disregarded since the state court mistakenly addressed the wrong

13  issue: "whether the jury had to be instructed to find the *target offense* to be first degree murder,"

14  which was "not Tim's contention."  Petitioner asserts: "Murder was not alleged as the target

15  offense– it was alleged as the natural and probable consequence."  (Brief in Support of Traverse,

16  Doc. 39 at 39-40.)  Here, it is recommended that the merits of the claim be reached since the state

17  court's decision reaching the merits of petitioner's claim does not clearly rest on a state law

18  ground that was independent of the federal question and adequate to support the judgment.  *See*

19  *Coleman*, 501 U.S. at 729; *Calderon*, 96 F.3d at 1129.

20         A claim of instructional error is cognizable on federal habeas corpus only if it "so

21  infected the entire trial that the resulting conviction violates due process."  *Estelle v. McGuire*,

22  502 U.S. at 72; *see also Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Cupp v. Nauhten*, 414

23  U.S. 141, 146-47 (1973).  It is not enough to show that the instruction was "undesirable,

24  erroneous, or even universally condemned"; rather, it must have actually rendered the trial

25  fundamentally unfair.  *Estelle*, 502 U.S. at 72.  The challenged instruction "may not be judged in

26  artificial isolation, but must be considered in the context of the instructions as a whole and the

1   trial record." *Id*. A due process violation results only if there is a reasonable likelihood that the

2   jury misapplied the challenged instruction in a manner that violates the Constitution. *Id*. (citing

3   *Boyde v. California*, 494 U.S. 370, 380 (1990)); *see also Middleton v. McNeil*, 541 U.S. 433, 437

4   (2004) (applying standard to uphold erroneous instruction). A jury instruction that subverts the

5   requirement that a criminal defendant be convicted only upon proof beyond a reasonable doubt of

6   every element of the offenses charged violates due process. *McNeil*, 541 U.S. at 437.

7           In addition, on federal habeas corpus review, no relief can be granted without a

8   showing that the instructional error had a "substantial and injurious effect of influence in

9   determining the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 147 (1998) (citing *Brecht*,

10  507 U.S. at 637); *Bains v. Cambra*, 204 F.3d 964, 971 n. 2 (9th Cir. 2000) (habeas relief is

11  unwarranted unless "it is reasonably probable that a result more favorable to the appealing party

12  would have been reached in the absence of the error") (internal quotation omitted).

13          Petitioner's claim of instructional error does not warrant habeas corpus relief.

14  The crux of his argument is that the jury might have convicted him of first degree murder under a

15  theory of natural and probable consequences without finding the required elements of first degree

16  murder. Petitioner contends: "Neither the instructions, nor the prosecutor's arguments to the

17  jury, referred to 'first degree murder' – or to a premeditated and deliberate killing, a killing

18  during a kidnapping, or a killing by poison – as being a "natural and probable consequence" of

19  any conspiracy alleged against Tim, or of any act allegedly aided and abetted by Tim." (Brief in

20  Support of Petition at 114.)

21          But, as petitioner notes, the jury found true the special circumstance alleged of

22  "felony during commission of kidnapping, first degree murder" (*see* subsection G, *infra*),

23  demonstrating that the jury relied on the felony murder rule to find petitioner guilty of first

24  degree murder. In the brief supporting his traverse, petitioner argues that this special

25  circumstance verdict cannot be relied upon to uphold the first degree murder verdict because the

26  trial court erred in its instructions on the special circumstance, as alleged in ground seven of his

1  federal petition.  This argument fails, for the reasons discussed in subsection F, *infra*.

2          Moreover, contrary to petitioner's argument, viewing the challenged instructions

3  not in isolation, but rather in context of all the others given, there is no reasonable likelihood that

4  they were unconstitutionally applied.  The jury instructions on murder first degree murder made

5  it clear that the jury could not convict a defendant of that offense without finding all the required

6  elements.  In particular, the jury was instructed that if the jury found a defendant was guilty of

7  murder, the jury had to decide whether it was murder of the first degree or murder of the second

8  degree.  (RT at 1737.)  Regarding first degree murder, the jury was instructed:

9          The defendants have been prosecuted *for murder in the first degree*
           under three separate theories: First[,] the murder was willful,
10         deliberate and premeditated; secondly, the murder was committed
           by torture; and thirdly, the murder was committed by poisoning...

11
           ...
12
           [¶] ...Each theory of *first-degree murder* has different requirements
13         and I'll instruct you on all of those requirements.

14  (RT at 1737 (emphasis added).)  Instructions on each of the three theories of first degree murder

15  followed; each reiterated that the defendant was guilty of first degree murder only if those

16  elements were proved.  (RT at 1737-39.)  The court's instructions continued:

17         All other murders are of the second degree.  The People have a
           burden of proving beyond a reasonable doubt that the killing was
18         first degree murder rather than a lesser crime.  If the People have
           not met this burden, you must find the defendants not guilty of
19         first-degree murder.

20  (RT at 1739; *see also* RT at 1747 ("The People have the burden of proving that the defendant

21  committed first-degree murder rather than a lesser offense...").)

22          Thus, even though the words "first degree murder" were not explicitly included in

23  the instructions on natural and probable consequences, other instructions made sufficiently clear

24  that petitioner could not be convicted of first degree murder without the elements of first degree

25  murder being found.  Finally, it is noted that the verdict forms explicitly required the jury to find

26  petitioner guilty or not guilty of first degree-murder (*see* RT at 1746), and the jury checked the

box indicating that petitioner was guilty of first degree murder.  Under these circumstances, there is no reasonable probability that the jury convicted petitioner of first degree murder without the required elements having been found.

Petitioner also fails to demonstrate that the alleged error had a substantial and injurious effect of influence in determining the jury's verdict.  There is no likelihood that a more favorable outcome would have resulted had an additional instruction were given.  An aider and abettor is not required to share the perpetrator's mental state; the relevant question is solely an objective test: "whether a reasonable person under like circumstances would recognize that the crime was a reasonably foreseeable consequence of the act aided and abetted." *People v. Woods*, 8 Cal.App.4th 1570, 1587-88 (3rd Dist. 1992).  Contrary to petitioner's assertion, a reasonable person under similar circumstances would recognize that a premeditated and deliberate killing, a murder by poison, or a murder during a kidnapping was a natural and probable consequence of conspiracy to torture.  The evidence in this case does not raise a question whether the first degree murder of the victim was a reasonably foreseeable consequence of the conspiracy to commit the target crimes alleged.

G.    Ground Seven- Jury Instructions on the Special Circumstance Allegation

As set forth in the previous subsection, the jury found true the special circumstance allegation that petitioner committed the murder while he was engaged in the commission of felony kidnapping.  Petitioner claims that the trial court erred in violation of due process and the Sixth Amendment when it instructed the jury on this special allegation with CALCRIM No. 730, but without CALCRIM Nos. 700 and 703.

CALCRIM 730, which was given at trial, instructs:

The defendants are charged with the special circumstance of murder committed while engaged in the commission of kidnapping.

To prove that this special circumstance was true, the People must prove that:

1. The defendant committed, or aided and abetted, or was a member of a conspiracy to commit kidnapping;

2. The defendant intended to commit, or intended to aid and abet the perpetrator in committing, or intended that one or more members of the conspiracy commit kidnapping;

3. If the defendant did not personally commit kidnapping, then a perpetrator, whom the defendant was aiding and abetting or with whom the defendant conspired, personally committed kidnapping;

4. The defendants or others with whom the defendants were aiding and abetting or with whom the defendants conspired did an act that caused the death of another person;

5. The act causing the death and the kidnapping were part of one continuous transaction;

AND

6. There was a logical connection between the act causing the death and the kidnapping. The connection between the fatal act and the kidnapping must involve more than just their occurrence at the same time and place.

To decide whether the defendants and the perpetrators committed kidnapping, please refer to the separate instructions that I will give you on [the] crimes. To decide whether the defendant aided and abetted a crime, please refer to the separate instructions that I will give you on aiding and abetting. To decide whether the defendant was a member of a conspiracy to commit a crime, please refer to the separate instructions that I will give you on conspiracy. You must apply those instructions when you decide whether the People have proved this special circumstance.

The defendants must have intended to commit, or aided and abetted, or been a member of a conspiracy to commit the felony of kidnapping before or at the time of the act causing death.

In addition, in order for this special circumstance to be true, the People must prove that the defendants intended to commit kidnapping independent of the killing. If you find that the defendants only intended to commit murder and the commission of kidnapping was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved.

*People v. Stayer*, *supra*, at 14 -15; (*see also* RT at 1748-50).

CALCRIM No. 700 (Special Circumstances: Introduction), if given at petitioner's trial, would have instructed:

If you find (the/a) defendant guilty of first degree murder, you must also decide whether the People have proved that [one or more of] the special circumstance[s] is true.

The People have the burden of proving (the/each) special circumstance beyond a reasonable doubt. If the People have not met this burden, you must find the special circumstance has not been proved. [You must return a verdict form stating true or not true for each special circumstance on which you all agree.]

In order for you to return a finding that a special circumstance is or is not true, all 12 of you must agree.

[You must (consider each special circumstance separately/ [and you must] consider each special circumstance separately for each defendant.) ]" (CALCRIM No. 700 (2006-2007).)

*People v. Stayer*, *supra*, at 15.

CALCRIM No. 703 (Special Circumstances: Intent Requirement for Accomplice After June 5, 1990-Felony Murder), if given at trial would have instructed:

If you decide that (the/a) defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstance[s] of _____, you must also decide whether the defendant acted either with intent to kill or with reckless indifference to human life.

In order to prove (this/these) special circumstance[s] for a defendant who is not the actual killer but who is guilty of first degree murder as (an aider and abettor/ [or] a member of a conspiracy), the People must prove either that the defendant intended to kill, or the People must prove all of the following:

1. The defendant was a major participant in the crime;

AND

2. When the defendant participated in the crime, (he/she) acted with reckless indifference to human life.

[A person acts with reckless indifference to human life when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death.]

[The People do not have to prove that the actual killer acted with intent to kill or with reckless indifference to human life in order for the special circumstance[s] of _____ to be true.]

46

[If you decide that the defendant is guilty of first degree murder, but you cannot agree whether the defendant was the actual killer, then, in order to find (this/these) special circumstance[s] true, you must find either that the defendant acted with intent to kill or you must find that the defendant acted with reckless indifference to human life and was a major participant in the crime.]

If the defendant was not the actual killer, the People have the burden of proving beyond a reasonable doubt that (he/she) acted with either the intent to kill or with reckless indifference to human life and was a major participant in the crime for the special circumstance[s] of _____ to be true. If the People have not met this burden, you must find (this/these) special circumstance[s] (has/have) not been proved true [for that defendant]." (CALCRIM No. 703 (2006-2007).)

*People v. Stayer*, *supra*, at 15-16.

On direct appeal, citing the Bench Notes to CALCRIM Nos. 700 and 703, the California Court of Appeal assumed that those instructions should have been given, sua sponte, at petitioner's trial. Nevertheless, the state court found the trial court's failure to so instruct was harmless because the jury necessarily made the required findings under other properly given instructions:

As to burden of proof, the jury received CALCRIM Nos. 103 and 220, both instructing that the People had the burden to prove each element of "a crime *and special allegation* " beyond a reasonable doubt. (Italics added.) In addition to CALCRIM No. 730, the jury was instructed on the elements of kidnapping with CALCRIM No. 1215, and on aiding-and-abetting and conspiracy with the array of instructions cited in part I.F. These instructions sufficiently explained the People's burden of proof as to the special circumstance.

As to intent, the jury received CALCRIM No. 252 (Union of Act and Intent: General and Specific Intent Together), which instructed that though kidnapping requires only general intent, commission of murder while engaged in kidnapping requires a specific intent which would be explained in the instruction for that allegation (CALCRIM No. 730), as it was. In addition, the aiding-and-abetting and conspiracy instructions specified the intents required for conviction on those theories.

As to an individualized finding on Timothy's personal role, the trial court gave CALCRIM No. 203, which instructed the jury to consider the evidence and decide each charge for each defendant separately. The court also gave CALCRIM Nos. 540A (Felony

47

1   Murder: First Degree-Defendant Allegedly Committed Fatal Act)
    and 540B (Felony Murder: First Degree-Coparticipant Allegedly
2   Committed Fatal Act), which specifically instructed on how to
    consider the defendants' respective roles. Furthermore, CALCRIM
3   No. 730 instructed that a defendant might be guilty of the alleged
    special circumstance either as a perpetrator, and aider and abettor,
4   or a conspirator.

5   As for unanimity, the trial court gave CALCRIM No. 3550, which
    states in part: "Your verdict must be unanimous. This means that,
6   to return a verdict, all of you must agree to it."

7   So instructed, the jury convicted Timothy of murder and
    kidnapping. Thus, to convict Timothy of murder in the commission
8   of kidnapping, the jury must have found every required element
    proved beyond a reasonable doubt, must have determined
9   Timothy's individual liability as an aider and abettor or
    conspirator, and must have done so unanimously. Therefore the
10  omission of CALCRIM Nos. 700 and 703 was harmless. We
    conclude that any error was harmless beyond a reasonable doubt.

11

12  *People v. Stayer*, *supra*, at 16 -17.

13          Since other given instructions as cited by the state appellate court adequately

14  described the findings the jury had to make with respect to the special circumstance alleged, it is

15  of no moment if the trial court made an error of state law in failing to instruct with CALCRIM

16  Nos. 700 and 703.  Omission of those instructions did not subvert the requirement that petitioner

17  be convicted only upon proof beyond a reasonable doubt of every required element, nor did it

18  render his trial fundamentally unfair.  For this same reason, the omission did not have substantial

19  and injurious effect of influence in determining the jury's verdict, and the state court's finding of

20  no prejudice was not an unreasonable application of clearly established Supreme Court

21  precedent.  *See Coleman*, 525 U.S. at 147 (citing *Brecht*, 507 U.S. at 637).

22          H.      Ground Eight- Instruction on Felony Murder, First Degree

23          Petitioner claims the trial court failed to instruct on an element of the offense of

24  felony murder.  Petitioner explains that under California law, murder-by-torture is an offense

25  distinct from that of torture.  Cal. Penal Code §§ 189, 206.  The offenses have different elements,

26  with the chief difference being the mental state required.  Murder-by-torture requires the jury to

1  find deliberation and premeditation, while simple torture does not.  *People v. Vital*, 45

2  Cal.App.4th 441, 444-45 (1996).  The mental state for murder-by-torture is expressed as "murder

3  committed with a wil[l]ful, deliberate and premeditated intent to inflict extreme and prolonged

4  pain."  *People v. Elliott*, 37 Cal.4th 453, 466 (2005).

5         The trial court instructed with CALCRIM No. 540A, which indicated that

6  petitioner could be convicted of first degree murder if he committed torture, rather than "murder-

7  by-torture."  Regarding the elements of torture, the instruction referred the jury to the separate

8  instruction given on torture.  It is therefore reasonably probable, petitioner contends, that the jury

9  used the elements of simple torture, rather than the correct statement of first degree murder-by-

10 torture, included in CALCRIM No. 521B to convict.

11        On direct appeal, the California Court of Appeal agreed with petitioner's

12 argument that the trial court so erred:

13            [T]his definition of torture (§ 206) does not fully set out the
              required mental state for first degree murder by torture (§ 189)-the
14            intent to inflict "extreme and *prolonged* pain." (*People v. Steger*
              (1976) 16 Cal.3d 539, 546, 128 Cal.Rptr. 161, 546 P.2d 665, italics
15            added; accord, *People v. Elliot* (2005) 37 Cal.4th 453, 466, 35
              Cal.Rptr.3d 759, 122 P.3d 968.) As Robert further points out,[25] that
16            element of first degree murder by torture was not explained
              elsewhere in the instructions. Therefore, according to Robert, the
17            jury could have convicted him of first degree murder on this theory
              without making the required finding that he intended to inflict
18            *prolonged* pain on the victim, in violation of his constitutional
              right to have every element of an offense proven to the jury beyond
19            a reasonable doubt.

20 *People v. Stayer*, *supra*, at 17.

21        Nevertheless, the state court found no prejudice for the trial court's error:

22            Assuming that the trial court should have instructed on this aspect
              of the required intent for first degree murder by torture and that its
23            failure to do so withdrew an element of a crime from the jury's
              consideration, the error was harmless beyond a reasonable doubt
24            because there is "no reasonable probability that the outcome of the

25 ────────────────

      [25] Elsewhere in the opinion it is noted that petitioner joined in Robert's claim in this
26 regard.

                                        49

1       defendant's trial would have been different had the trial court
     properly instructed the jury." (*People v. Flood* (1998) 18 Cal.4th
2       470, 490, 76 Cal.Rptr.2d 180, 957 P.2d 869.) On the facts of this
     case, which included evidence that Robert brutally beat the victim
3       until stopped, poured insecticide into his eyes, then brutally beat
     him again, and finally abandoned him in his desperate condition in
4       a spot where he was likely to go on suffering for a substantial time,
     it is inconceivable that a properly instructed jury would not have
5       found that Robert had the intent to inflict "prolonged" pain.

6  *People v.Stayer*, *supra*, at 17.

7       Once again, the state court's finding of no prejudice is not an unreasonable

8  application of clearly established Supreme Court precedent.  For the reasons given by the state

9  court, the omission did not have substantial and injurious effect of influence in determining the

10  jury's verdict.  *See Coleman*, 525 U.S. at 147 (citing *Brecht*, 507 U.S. at 637).

11

12         I.     Ground Nine- Sufficiency of the Evidence on Deliberation and
                  Premeditation

13       Petitioner claims that the prosecution failed to prove that Robert had the requisite

14  intent for premeditated and deliberate first degree murder.  Accordingly, he argues, since his

15  liability as an aider and abettor or as a conspirator was derivative, insufficiency of proof of

16  Robert's intent necessarily affects the intent that he can be inferred to have shared.  Petitioner

17  notes that the jury's verdict does not explicitly reflect whether he was convicted of first degree

18  murder based on felony murder, or aiding and abetting or conspiring with Rob in the

19  premeditated and deliberate murder of the victim.  As already discussed, however, the jury found

20  petitioner guilty of the special circumstance that the murder occurred while petitioner was

21  engaged in felony kidnapping.

22       On direct appeal, the California Court of Appeal held, regarding this claim:

23       Robert contends[26] that the evidence as to him did not prove
     premeditation and deliberation, but only voluntary
24       manslaughter.[FN38] We disagree.

25  ─────────────────

26       [26] Elsewhere in the opinion it is noted that petitioner joined in Robert's claim in this
regard.

FN. 38 In his opening brief, Robert also discusses second degree murder in the abstract and provides an argument subheading which states: "The evidence in this case proved second degree murder or voluntary manslaughter." However, under that subheading Robert argues only for voluntary manslaughter (concluding with the assertion "[t]he facts of this case are thus consistent with voluntary manslaughter"). His first actual argument for second degree murder appears in his reply brief. Because that argument should have been raised and developed in his opening brief, we decline to consider it. (*Neighbours v. Buzz Oates Enterprises, supra,* 217 Cal.App.3d at p. 335, fn. 8, 265 Cal.Rptr. 788.)

Robert cites the categories of evidence for premeditation and deliberation set out in *People v. Anderson* (1968) 70 Cal.2d 15, 73 Cal.Rptr. 550, 447 P.2d 942 (*Anderson* ) at pages 25 through 27, 73 Cal.Rptr. 550, 447 P.2d 942 (planning activity, motive, and manner of killing), and asserts that the evidence fell short on all three. However, these categories are not definitive or a sine qua non for proving premeditation and deliberation. (*People v. Perez* (1992) 2 Cal.4th 1117, 1125-1126, 9 Cal.Rptr.2d 577, 831 P.2d 1159.)

As this court has noted, the tactic of "using [*Anderson's*] template as a straightjacket on the manner in which premeditation can be proven adequately at trial" is "discredited." (*People v. Gunder* (2007) 151 Cal.App.4th 412, 420, 59 Cal.Rptr.3d 817.) Therefore, we consider the evidence without "belaboring the bullet points of planning, motive, and manner of killing on which [ ] *Anderson* focused" (*ibid.*), viewing it most favorably to the verdict and deciding only whether substantial evidence supports that verdict. (*People v. Johnson* (1980) 26 Cal.3d 557, 578, 162 Cal.Rptr. 431, 606 P.2d 738.)

From first to last, Robert set out to hurt McCauliffe as much as possible, up to and including death. After beating him on the porch when he was already defenseless, Robert stole his cell phone to ensure that he could not get help, poured insecticide onto him, drove him or directed him to be driven to the boat ramp, stomped him eight times in the head, then drove away, leaving him in desperate condition in a cold, dark, deserted spot where it was easily foreseeable that, if unaided, he would soon die. Furthermore, each of Robert's assaults continued until he was stopped; thus, if not for Coyne's intervention at the house and Skelton's intervention at the boat ramp, Robert might well have killed McCauliffe immediately at one place or the other.

"Premeditation and deliberation do not require an extended period of time, merely an opportunity for reflection. [Citations.]" (*People v. Cook* (2006) 39 Cal.4th 566, 603, 47 Cal.Rptr.3d 22, 139 P.3d

492.) The sequence of events involving Robert took several hours, during which he had numerous opportunities to reflect but never changed his course of conduct. The jury could reasonably have found that this course of conduct proved premeditation and deliberation.

Robert asserts that this evidence merely proved "heat of passion" voluntary manslaughter, a lesser included offense on which the jury was instructed. We disagree.

"[H]eat of passion" voluntary manslaughter requires proof of provocation and heat of passion. (*People v. Lee* (1999) 20 Cal.4th 47, 59, 82 Cal.Rptr.2d 625, 971 P.2d 1001.) The provocation must be caused (or reasonably believed by the defendant to have been caused) by the victim, and must be "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]" (*Ibid.*) If "an ordinarily reasonable person," so provoked, would have acted in this manner, there is legally sufficient heat of passion to reduce murder to voluntary manslaughter. (*Ibid.*) It is not enough that the defendant actually acted in a heat of passion-the circumstances must have been such that the ordinarily reasonable person would have done the same. (*Id.* at p. 60, 82 Cal.Rptr.2d 625, 971 P.2d 1001.) A defendant who had time to reflect and cool down, but did not, cannot claim heat of passion. (*People v. Pride* (1992) 3 Cal.4th 195, 250, 10 Cal.Rptr.2d 636, 833 P.2d 643; *People v. Daniels* (1991) 52 Cal.3d 815, 868, 277 Cal.Rptr. 122, 802 P.2d 906.)

Robert asserts that he was provoked by the revelation that McCauliffe had had intercourse with defendants' mother, that this provocation would have aroused heat of passion in an ordinarily reasonable person, and that he acted in the grip of passion from then on. He relies on *People v. Borchers* (1958) 50 Cal.2d 321, 325 P.2d 97 (*Borchers* ). But in *Borchers,* the victim's final provocation immediately preceded the defendant's fatal act; thus, the court impliedly found that he had no time to reflect and cool down. (*Id* . at pp. 326, 328-329.) *Borchers* is therefore inapposite.

Robert has shown no error on this count.

*People v. Stayer*, *supra*, at 17 -18.

Once again, the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364. Sufficient evidence supports a conviction on habeas corpus so long as, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

1    The jury was instructed on the elements of first degree murder and premeditation

2  and deliberation as follows:

3    The defendants are guilty of first-degree murder if the People have
        proved that they acted willfully, deliberately, and with
4       premeditation.  The defendants acted willfully if they intended to
        kill.  The defendants acted deliberately if they carefully weighed
5       the considerations for and against their choice and, knowing the
        consequences, decided to kill.  The defendants acted with
6       premeditation if they decided to kill before committing the act that
        caused the defendant's death.
7
        The length of time the person spends considering whether to kill
8       does not alone determine whether the killing is deliberate and
        premeditated.  The amount of time required for deliberation and
9       premeditation may vary from person to person according to the
        circumstances.
10
        A decision to kill made rashly, impulsively, or without careful
11      consideration is not deliberate and premeditated; on the other hand,
        a cold, calculated, decision to kill can be reached quickly.  The test
12      is the extent of reflection, not the length of time.

13  (RT at 1737-38.)

14    Viewing all the evidence in the light most favorable to the prosecution, as this

15  court is required to do, the state appellate court's determination did not unreasonably apply the

16  standards of *Jackson* or *Winship*, for the reasons set forth in the state court's opinion.  Petitioner

17  is not entitled to relief for this or any of his claims of error.

18                          VI.  CONCLUSION

19    For the foregoing reasons, IT IS HEREBY RECOMMENDED that the application

20  for writ of habeas corpus be DENIED.

21    These findings and recommendations are submitted to the United States District

22  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-

23  one days after being served with these findings and recommendations, any party may file written

24  objections with the court and serve a copy on all parties.  Such a document should be captioned

25  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

26  shall be served and filed within seven days after service of the objections.  Failure to file

1  objections within the specified time may waive the right to appeal the District Court's order.

2  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

3  1991).

4  DATED: May 31, 2011

5  _____

6  CHARLENE H. SORRENTINO
   UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26